EXHIBIT A

192 3167

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:        **Joseph J. Simons, Chairman**
                      **Noah Joshua Phillips**
                      **Rohit Chopra**
                      **Rebecca Kelly Slaughter**
                      **Christine S. Wilson**

| | |
|---|---|
| **In the Matter of** | |
| | |
| **ZOOM VIDEO COMMUNICATIONS, INC.,** | **DOCKET NO.** |
| **a corporation, d/b/a ZOOM.** | |

## COMPLAINT

The Federal Trade Commission, having reason to believe that Zoom Video Communications, Inc., a corporation ("Respondent"), has violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1.    Respondent Zoom Video Communications, Inc. ("Zoom") is a Delaware corporation with its principal office or place of business at 55 Almaden Boulevard, 6th Floor, San Jose, California, 95113.

2.    The acts and practices of Respondent Zoom alleged in this complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

### Respondent's Business Practices

3.    Founded in 2011, Zoom is a videoconferencing platform provider that provides customers with videoconferencing services and various add-on services, such as cloud storage.  Zoom's 2019 annual revenue was $622.7 million; its Q1 2020 revenue was $328.2 million.  Zoom has over 2,000 employees.

4.    Zoom's core product is the Zoom "Meeting," which is a platform for one-on-one and group videoconferences.  Zoom Meetings also have the capability, among other things, for accompanying chat messages, screen sharing, and the recording of videoconferences. Zoom offers certain customers the option to host Zoom's videoconferencing services on the customer's internal network through its "Connecter" product.

5.    A Zoom Meeting is comprised of a host who organizes the Meeting and the individual attendees who participate in those video meetings.  To schedule and host a Zoom Meeting, a user must create a Zoom account and download Zoom's software application ("Zoom App") for desktop or laptop (e.g., Windows or Mac) or mobile (e.g., iOS or Android).

6.    By creating a Zoom account, a user can create and host a videoconference and invite others to attend by providing them with a hyperlink, conference identifier, or telephone dial-in instructions.  To join a Meeting, individual attendees typically download the Zoom App, but do not need to create a Zoom account.  Rather than download the Zoom App, attendees can also join a Meeting through their browser or by telephone.  Attendees who join a Meeting through their browser or by telephone do not have access to all of the same features that are available through the Zoom App.

7.    Zoom offers its videoconferencing services through a number of monthly and annual subscription plans.  Zoom offers a free basic videoconferencing plan that includes unlimited one-on-one and group videoconferencing for up to 40 minutes and 100 participants.  It also offers three tiers of paid plans based on the number of features and host licenses provided, with minimum monthly subscription fees of $14.99 (Pro), $199.90 (Business), and $999.50 (Enterprise).

8.    Zoom routinely collects certain information about users, including: first and last name; email address; user name and password; approximate location; date of birth; technical information about users' devices, network, and internet connection; and in the case of a paid subscription, billing address and payment card information of the account holder. Zoom also collects and stores event details for all Zoom Meetings, including the date, time, and length of Meetings; the Meeting participants' user names; and each participant's answers to any polling questions asked during a Meeting.  Finally, Zoom also collects and stores information shared while using the service, such as recorded Meetings that users store on Zoom's cloud storage, voice mails, chat and instant messages, files, and whiteboards.

9.    As of July 2019, Zoom had approximately 600,000 paid customers of its videoconferencing services.  Approximately 88% of those customers were small businesses with ten or fewer employees.

10.    In December 2019, approximately 10 million people worldwide participated in a Zoom Meeting each day.  By April 2020, that number had skyrocketed to 300 million daily meeting participants worldwide, in large part due to an increased demand for videoconferencing services as a result of social distancing recommendations and local government stay-at-home orders related to the novel coronavirus pandemic.  In addition to Zoom's traditional business customers, individuals, doctors, mental health professionals, schools, and others began to use Zoom's videoconferencing services in greater numbers.

11.     Users share sensitive information during Zoom meetings.  This can include financial information, health information, proprietary business information, and trade secrets.  For example, Zoom has been used for therapy sessions, Alcoholics Anonymous meetings, and telehealth appointments.

12.     As reflected in Zoom's Security Guide, the security of users' Zoom communications relies not only on its Meeting encryption or similar features, but also on its internal network security.  Malicious actors who infiltrate Zoom's internal network could gain access to Zoom's administrative controls and compromise Zoom users' personal information.  Despite this, Zoom, among other things, has:

   a.     Failed to implement a training program on secure software development principles;

   b.     Failed to test, audit, assess, or review its applications for security vulnerabilities at certain key points, such as prior to releasing software updates, including failing to ensure that its software is free from commonly known or reasonably foreseeable attacks, such as "Structured Query Language" (SQL) injection attacks and "Cross-Site Scripting" (XSS) attacks;

   c.     Failed to monitor service providers or other contractors who have access to Zoom's network;

   d.     Failed to secure remote access to its networks and systems through multi-factor authentication or similar technology;

   e.     Failed to use readily available measures to safeguard against anomalous activity and/or cybersecurity events across all of Zoom's systems, networks, and assets within those networks, including monitoring all of Zoom's networks and systems at discrete intervals, properly configuring firewalls, and segmenting its networks;

   f.     Failed to implement a systematic process for incident response;

   g.     Failed to implement a systematic process for inventorying, classifying, and deleting user data stored on Zoom's network; and

   h.     Been a year or more behind in patching software in its commercial environment.

**Respondent's Deceptive and Unfair Privacy and Security Practices**

13.     Zoom has made numerous, prominent representations touting the strength of the privacy and security measures it employs to protect users' personal information.  For example, Zoom has claimed on its website, in Security Guides, and in its privacy policy, that it takes "security seriously," that it "places privacy and security as the highest priority," and that it "is committed to protecting your privacy."

3

14.   The privacy and security of video communications, including the level of encryption used to secure those communications, is important to users and their decisions about which videoconferencing platform to use, the price to pay for such services, and/or how they use those services.  In numerous blog posts, Zoom has pointed to its security as a reason for potential customers to use Zoom's videoconferencing services.  In a January 2017 blog post, "Zoom: The Fastest Growing App on Okta," Zoom specifically cited, based on customer feedback, its security feature of "end-to-end AES 256 bit encryption" as important to businesses and one of the reasons for Zoom's growth.

<u>Zoom's Deceptive End-to-End Encryption Claims</u>

15.   End-to-end encryption is a method of securing communications where an encrypted communication can only be deciphered by the communicating parties.  No other persons can decrypt the communications because they do not possess the necessary cryptographic keys to do so.  End-to-end encryption is intended to prevent communications from being read or modified by anyone other than the true sender and recipient(s).

16.   Since at least June 2016, Zoom has represented in its App, on its website, in its Security Guides, in its HIPAA Compliance Guide, in blog posts, and in direct communications with customers, that it offered end-to-end encryption to secure videoconference communications between hosts and attendees during Zoom Meetings.

17.   For example, Zoom has represented that it provided end-to-end encryption in the Zoom App.  When a user hovered over a green padlock in the top left corner of a Meeting, the user would see a popup stating, "Zoom is using an end to end encrypted connection."

18.   Zoom also has represented that it employed end-to-end encryption for Zoom Meetings on the "meetings" and "security" pages of its public website, available at zoom.us/meetings and zoom.us/security.  For example, on its "meetings" webpage, Zoom claimed that it offered end-to-end encryption for "all meetings":



19.   Zoom has made similar representations in its Security Guides, which are available through its public website at www.zoom.us/security.  In its June 2019 Security Guide, Zoom explained that Meeting hosts could "Enable an end-to-end (E2E) encrypted meeting."  Zoom likewise claimed in its June 2016 Security Guide that Meeting hosts could "Secure a meeting with end-to-end encryption (E2E)."  Zoom also claimed that it used "industry-standard end-to-end" encryption with AES 256-bit encryption as a way

for its healthcare customers to comply with the Health Insurance Portability and Accountability Act (HIPAA)'s Security Rule.  The HIPAA Security Rule applies to certain healthcare entities and contains federally mandated standards for protecting individuals' electronic personal health information.

20. For example, on the "healthcare" webpage of Zoom's website, available at zoom.us/healthcare, Zoom claimed that its customers could "Achieve HIPAA (signed BAA) and PIPEDA/PHIPA compliance with complete end-to-end 256-bit AES encryption."  Zoom similarly explained in its June 2016 and July 2017 HIPAA Compliance Guides, available through its public website at zoom.us/healthcare, that its end-to-end encryption, among other security features, supported its healthcare customers' compliance with the HIPAA Security Rule:

> **Security and Encryption**
> Only members invited by account administrators can host Zoom meetings in accounts with multiple members. The host controls meeting attendance through the use of meeting IDs and passwords. Each meeting can only have one host. The host can screen share or lock screen sharing. The host has complete control of the meeting and meeting attendees, with features such as lock meeting, expel attendees, mute/unmute all, lock screen sharing, and end meeting.
>
> Zoom employs industry-standard end-to-end Advanced Encryption Standard (AES) encryption using 256-bit keys to protect meetings. Zoom encryption fully complies with HIPAA Security Standards to ensure the security and privacy of patient data.

21. In a January 2019 white paper entitled "End to End Encryption," Zoom represented that it offered end-to-end encryption for Zoom Meetings as an "added layer of application security for Zoom meetings, webinars, and chat (instant messaging) sessions."  Zoom explained that end-to-end encryption meant that Zoom Meetings, webinars, and chat sessions could only be decrypted by "authenticated participant(s) who have the key required for decryption."  The white paper also explained that video, audio, and screen sharing were all "protected with the Advanced Encryption Standard (AES) 256-bit algorithm."

22. Zoom specifically touted its level of encryption as a reason for customers and potential customers to use Zoom's videoconferencing services in numerous blog posts on its website.  For example, in an April 24, 2017 blog post, "Zoom Reporting Live from American Telemedicine Association 2017," Zoom promoted its "End-to-end AES 256-bit encryption of all meeting data and instant messages" as a reason for healthcare providers to use Zoom as their telehealth videoconferencing solution.

23. Additionally, in response to inquiries from customers or potential customers who contacted Zoom directly to ask about Zoom's security practices and the level of encryption it employed for Zoom Meetings, Zoom informed them that it offers AES 256-bit, end-to-end encryption and directed them to its Security Guide that, as described above, made similar representations.

24.    In fact, Zoom did not provide end-to-end encryption for any Zoom Meeting that was conducted outside of Zoom's "Connecter" product (which are hosted on a customer's own servers), because Zoom's servers—including some located in China—maintain the cryptographic keys that would allow Zoom to access the content of its customers' Zoom Meetings.  Zoom has acknowledged that its Meetings were generally incapable of end-to-end encryption in an April 2020 blog post by its Chief Product Officer:

> In light of recent interest in our encryption practices, we want to start by apologizing for the confusion we have caused by incorrectly suggesting that Zoom meetings were capable of using end-to-end encryption. Zoom has always strived to use encryption to protect content in as many scenarios as possible, and in that spirit, we used the term end-to-end encryption. While we never intended to deceive any of our customers, we recognize that there is a discrepancy between the commonly accepted definition of end-to-end encryption and how we were using it. This blog is intended to rectify that discrepancy and clarify exactly how we encrypt the content that moves across our network.

https://blog.zoom.us/wordpress/wpcontent/uploads/2020/04/zoom-servers-news.jpg.

### Zoom's Deceptive Claims Regarding Level of Encryption

25.    Encrypting communications with the Advanced Encryption Standard (AES) and a 256-bit encryption key can be an effective way to secure communications and prevent eavesdropping.  The 256-bit encryption key refers to the length of the key needed to decrypt the communications.  Generally speaking, a longer encryption key provides more confidentiality protection than shorter keys because there are more possible key combinations, thereby making it harder to find the correct key and crack the encryption.

26.    Since at least June 2015, Zoom has made numerous and prominent claims that it encrypted Zoom Meetings, in part, by using AES, with a 256-bit encryption key ("AES 256-bit Encryption" or "256-bit Encryption").

27.    For example, in a June 2015 blog post entitled "Why Zoom's Security Features Matter for your Business," available at https://blog.zoom.us/wordpress/2015/06/17/why-zooms-security-matter-for-business/, Zoom explained that encryption was important for video communications because people "discuss sensitive things in unplanned moments," and touted "**Zoom's use of AES 256 encryption**" as making it "**it impossible for a hacker to grab anything outside of a hopelessly garbled transmission**…" (emphasis in original).

28.    On the "security" page of Zoom's website, available at zoom.us/security, Zoom also has claimed that it used 256-bit Encryption to protect user data:



Protecting your Data
Communications are established using 256-bit TLS encryption and all shared content can be encrypted using AES-256 encryption.

6

29.    Zoom likewise claimed that it uses 256-bit Encryption in its Security Guide and in its online Help Center.  For example, Zoom's June 2019 Security Guide stated, "Webinar contents and screen sharing are secured using AES 256 and communicate over secured network using 256-bit encryption standard."  In Zoom's online Help Center, available at https://support.zoom.us/hc/en-us/articles/201362723-Encryption-for-Meetings, Zoom answered a "Frequently Asked Question[]" about its Meeting encryption by explaining, in part, that its Meetings were encrypted "by default" with AES 256-bit Encryption:

## Encryption for Meetings

## Overview

By default, Zoom encrypts in-meeting and in-webinar presentation content at the application layer using TLS 1.2 with Advanced Encryption Standard (AES) 256-bit algorithm for the Desktop Client.

30.    In fact, Zoom used a lower level of encryption for securing Zoom Meetings, AES 128-bit encryption in Electronic Code Book ("ECB") mode.  AES 128-bit encryption uses a shorter encryption key than AES 256-bit Encryption, and therefore provides less confidentiality protection because there are fewer possible values for the 128-bit key than for a 256-bit key.  Reflecting the comparative strength of AES 256-bit Encryption and AES 128-bit Encryption, the National Security Agency has reported that AES 256-bit Encryption may be used for securing "TOP SECRET" materials, whereas AES 128-bit encryption may only be used for securing "SECRET" communications.

Zoom's Deceptive Claims Regarding<br>Secure Storage for Zoom Meeting Recordings

31.    Zoom offers customers the ability to record their Zoom Meetings and store such recordings on either the host's local device or, for paying customers, in Zoom's secure cloud storage ("Cloud Recordings").

32.    In Zoom's June 2019 Security Guide, Zoom claims that Cloud Recordings are processed and stored in Zoom's cloud "after the meeting has ended," where they "are stored encrypted as well."  Zoom's June 2016 Security Guide similarly claimed that Cloud Recordings "are processed and securely stored in Zoom's cloud once the meeting has ended."

33.    In fact, recorded Meetings are kept on Zoom's servers for up to 60 days, unencrypted, before Zoom transfers the recordings to its secure cloud storage, where they are then stored encrypted.

<u>Zoom's Unfair Circumvention of a</u>
<u>Third-Party Privacy and Security Safeguard</u>

34.    In July 2018, Zoom updated its App for Mac computers by deploying a web server onto users' computers—without adequate user notice or consent—in order to circumvent a security and privacy safeguard in Apple's Safari browser.  Specifically, Apple had updated its Safari browser to help defend its users from malicious actors and popular malware by requiring interaction with a dialogue box when a website or link attempts to launch an outside App.

35.    As a result of the new browser safeguard, users who clicked on a link to join a Zoom Meeting would receive an additional prompt that read, "Do you want to allow this page to open 'zoom.us'?"  If the user selected "Allow," the browser would connect the user to the Meeting, while clicking "Cancel" would end the interaction and prevent the Zoom App from launching.

36.    To avoid this dialogue box, Zoom issued a manual update in July 2018 for its Zoom App for Mac desktop computers that secretly deployed a web server, called the "ZoomOpener," as a means to bypass the new privacy and security safeguard.

37.    The ZoomOpener web server was installed on users' Mac computers and operated in the computer's background.  When it detected a request to join a Zoom Meeting, the web server bypassed the new Safari browser safeguard to directly launch the Zoom App.  It would then automatically join the user to the Zoom Meeting and, if the user had not changed her default video settings, automatically activate the user's webcam.  Zoom automatically activated users' webcams immediately upon their joining a Meeting unless users changed their default video settings by logging into their Zoom account, going to their "preferences," clicking on "video," and then finding and clicking on the box, "Turn off my video when joining a meeting."

38.    The ZoomOpener web server harmed consumers by limiting the intended benefit of a privacy and security safeguard provided by their Safari browser.  Zoom did not implement any compensating measures to replace the privacy and security protections that it had circumvented, nor did Zoom take any steps to address the risks that malicious actors could exploit the ZoomOpener web server and harm users.  Without the circumvented Safari safeguard, one wrong click could expose consumers to remote video surveillance by strangers through their computers' webcams.

39.    For example, malicious actors could exploit this vulnerability by using a phishing attack, a common form of cyberattack that typically entails a criminal sending out thousands of emails that pretend to be from a legitimate source in order to direct recipients to a bogus website where the criminal can capture personal information or engage in other malicious activity.  Here, the phishing email could trick consumers into clicking on an innocuous-looking link that does not appear to be a Zoom Meeting invite.  This link could then direct the consumer to an otherwise benign-looking website that has a Zoom Meeting embedded in it.  Zoom Meetings can be embedded in websites through the use of the

8

iframe HTML tool, which allows a segment of a website to display content from another source without leaving the original website (such as a YouTube video playing on a host's website).

40.     Without the consumer taking any additional steps, the ZoomOpener web server would automatically join the consumer to the Zoom Meeting and activate her webcam—without the user's consent and perhaps without even realizing it.  Merely leaving the website would not exit the Meeting or disable the webcam.  Had Zoom not circumvented the Safari safeguard, users would have been alerted to the Zoom Meeting and would have had to give their permission before being joined to the Meeting.

41.     In addition to bypassing the Safari browser safeguard, the ZoomOpener web server also harmed users by introducing two additional security vulnerabilities.  First, the web server exposed some users to a potential Remote Control Execution (RCE) attack because the ZoomOpener web server would download and install software updates, including potentially malicious code, without properly validating that it was downloading the software from a trusted source.  This code could then allow the malicious actor to execute code on the user's computer.  On July 9, 2019, Zoom posted information about this vulnerability on its website, available at https://support.zoom.us/hc/en-us/articles/360031245072-Security-CVE-2019-13567, where it characterized the vulnerability as having "High Severity."  Second, the ZoomOpener web server exposed users to a local denial of service ("DoS") attack where a hacker could potentially target a Zoom user with an endless loop of invalid Meeting join requests that would effectively cause the targeted machine to lock up.

42.     As discussed in further detail in Paragraphs 49-52 below, Zoom did not notify users that its manual software update would install the ZoomOpener web server on their Mac computers.  Nor did Zoom provide users with any information about the web server's operation, including the fact that it would bypass a Safari privacy and security safeguard.

43.     In addition to bypassing the Safari privacy and security safeguard to launch Zoom Meetings, the ZoomOpener web server had a second function: to reinstall the Zoom App.  Specifically, if a Mac user deleted the Zoom App in accord with Apple's instructions for deleting apps, the ZoomOpener web server would nevertheless remain on users' computers.  If the user later clicked on a Zoom Meeting invite or visited a website with an embedded Zoom Meeting, the web server would secretly reinstall the Zoom App—without any user interaction—and automatically join the user to the Meeting.

44.     Because the ZoomOpener web server remained and continued to function on users' computers even after the Zoom App was deleted, the vulnerabilities described in Paragraphs 39-41 persisted after users deleted the Zoom App.

45.     Zoom's deployment of the ZoomOpener web server—without adequate notice or consent—to circumvent a browser privacy and security safeguard, while also exposing users to additional security vulnerabilities as described in Paragraph 41, reflects Zoom's poor privacy and security practices.  As described more fully in Paragraph 12, Zoom's

9

security policies and practices have been inconsistently applied across its systems, and it has lacked an effective training program on secure software development principles.

46.     The ZoomOpener web server's vulnerabilities impacted over 3.8 million U.S. consumers who had the ZoomOpener web server secretly installed on their Mac computers.

47.     After a security researcher published information about the web server in early July 2019, Zoom issued a patch to remove the ZoomOpener web server from users' computers.  A day later, Apple, Inc. issued a silent operating system update to protect Mac users from the ZoomOpener web server and automatically removed the web server from their computers.  Although Zoom still allows customers to embed Meetings on their own websites, Zoom introduced a new video preview screen so that users would be able to see their own webcam stream before joining a Meeting.

48.     Consumers could not reasonably have avoided the harms resulting from the secret deployment of the ZoomOpener web server.  Zoom did not inform users that it was installing the ZoomOpener web server on their computer or otherwise provide any information about its operation, and it did not inform users that the web server would remain on their computers after they uninstalled the Zoom App.  Consumers also had no way of independently knowing about the web server's security vulnerabilities.  This substantial injury is not offset by countervailing benefits to consumers or competition.

### Zoom's Deceptive Deployment of the ZoomOpener Web Server

49.     The ZoomOpener web server was deployed as part of a manual software update for Zoom's Mac App on July 1, 2018 ("Web Server Update").  Within the Zoom App, Zoom notifies users of software updates in several ways: a pop up window; a blue bar that informs users that new updates are available; and through a "check for updates" feature available through a drop down menu under the user's profile icon.

50.     The pop-up notification and "check for updates" feature both provide users with "Release Notes" that give information about the update, such as a listing of new and enhanced features included in the update as well as any resolved issues, such as bug fixes.  They also include an "Update" button for users to click and manually update their software.

51.     As reflected in the Release Notes shown below, Zoom told users that the Web Server Update would fix minor bugs.  Zoom failed to disclose, or disclose adequately, that the update would install a local hosted web server, that the web server would circumvent a Safari browser privacy and security safeguard, or that it would remain on users' computers even after they had deleted the App:

July 1, 2018 Version **4.1.27695.0702**
Download Type: Manual

**Resolved issues**

- **Minor bug fixes**

52.   The omitted information was not available to users from any other source, and would have been material to their decision on whether or not to install the update. Indeed, when Zoom announced in early July 2019 that it would update its software to remove the ZoomOpener web server, it reported that it was doing so in response to customer feedback.

53.   For example, some consumers made the following public comments about Zoom's secret deployment of the ZoomOpener web server:

- "I think they [Zoom] need to be made aware that this isn t acceptable…I do not believe this is a fair trade-off - allowing any arbitrary web site local control of privileged software installed on my machine - because Safari offers a security prompt (specifically so that any arbitrary web site does not gain control of privileged software on my machine). I will be switching ~/.zoomus/ZoomOpener.app off, and considering other options until it has been fixed."

- "I liked Zoom when I used it a couple of times, but the reinstall 'feature' [of the ZoomOpener web server] is a huge violation of my trust. Software from the company behind it will not touch my system anymore."

- "I cancelled my subscription because of [Zoom's installation of the ZoomOpener web server]… This should not be considered OK."

## VIOLATIONS OF THE FTC ACT

### Count I
### Deceptive Representation Regarding End-to-End Encryption

54.   As alleged in Paragraphs 14-23, Zoom has represented, directly or indirectly, expressly or by implication, that it employed end-to-end encryption to secure the content of communications between participants using Zoom's video conferencing service.

55.   In fact, as described in Paragraph 24, Zoom did not employ end-to-end encryption to secure the content of communications between participants using Zoom's video conferencing service. Therefore, the representation set forth in Paragraph 54 is false or misleading.

### Count II
### Deceptive Representation Regarding Level of Encryption

56.   As alleged in Paragraphs 25-29, Zoom has represented, directly or indirectly, expressly or by implication, that it employed 256-bit Encryption to secure the content of communications between participants using Zoom's video conferencing service.

11

57.    In fact, as described in Paragraph 30, Zoom did not employ 256-bit Encryption to secure the content of communications between participants using Zoom's video conferencing service.  Therefore, the representation set forth in Paragraph 56 is false or misleading.

### Count III
### Deceptive Representation Regarding
### Secured Cloud Storage for Recorded Meetings

58.    As alleged in Paragraphs 31-32, Zoom has represented, directly or indirectly, expressly or by implication, that recorded Meetings are stored encrypted in Zoom's cloud storage immediately after a Meeting has ended.

59.    In fact, as set forth in Paragraph 33, recorded Meetings are not stored encrypted in Zoom's cloud storage immediately after a Meeting has ended.  Therefore, the representation set forth in Paragraph 58 is false or misleading.

### Count IV
### Unfair Circumvention of Third-Party Privacy and Security Safeguard

60.    As alleged in Paragraphs 34-48, Zoom installed the ZoomOpener web server, without adequate notice or consent, to circumvent a browser privacy and security safeguard and did not implement measures to replace the circumvented privacy and security protections.

61.    Respondent's actions caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition.  Therefore, the practice set forth in Paragraph 60 is an unfair act or practice.

### Count V
### Deceptive Failure to Disclose

62.    As alleged in Paragraph 51, in connection with the advertising, marketing, promotion, offering for sale, or sale of its video conferencing products, Respondent represented, directly or indirectly, expressly or by implication, that Zoom was updating its Mac App in order to resolve minor bug fixes.

63.    In numerous instances in which Respondent made the representation set forth in Paragraph 62, Respondent failed to disclose or disclose adequately that the update would deploy a local hosted web server, that the web server would circumvent a Safari browser privacy and security safeguard, or that the web server would remain on users' computers even after they had uninstalled the Zoom App.

64.    In light of the representation described in Paragraph 62, Respondent's failure to disclose or disclose adequately the material information as set forth in Paragraph 63 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

12

## Violations of the FTC Act

65.     The acts and practices of Zoom as alleged in this complaint constitute unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).


        THEREFORE, the Federal Trade Commission this _____ day of _____, 2020, has issued this Complaint against Respondent.

        By the Commission.

                                                                April J. Tabor
                                                                Acting Secretary


SEAL:

13

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**      **Joseph J. Simons, Chairman**
                                         **Noah Joshua Phillips**
                                         **Rohit Chopra**
                                         **Rebecca Kelly Slaughter**
                                         **Christine S. Wilson**

| | |
|---|---|
| **In the Matter of** | **FILE No. 192 3167** |
| **ZOOM VIDEO COMMUNICATIONS, INC.,** a corporation, d/b/a ZOOM. | **AGREEMENT CONTAINING CONSENT ORDER** |

The Federal Trade Commission ("Commission") has conducted an investigation of certain acts and practices of Zoom Video Communications, Inc. ("Proposed Respondent"). The Commission's Bureau of Consumer Protection ("BCP") has prepared a draft of an administrative Complaint ("draft Complaint"). BCP and Proposed Respondent, through its duly authorized officer, enter into this Agreement Containing Consent Order ("Consent Agreement") to resolve the allegations in the attached draft Complaint through a proposed Decision and Order to present to the Commission, which is also attached and made a part of this Consent Agreement.

**IT IS HEREBY AGREED** by and between Proposed Respondent and BCP, that:

1.  The Proposed Respondent is Zoom Video Communications, Inc., also doing business as Zoom, a Delaware Corporation with its principal office or place of business at 55 Almaden Boulevard, 6th Floor, San Jose, California, 95113.

2.  Proposed Respondent neither admits nor denies any of the allegations in the Complaint, except as specifically stated in the Decision and Order. Only for purposes of this action, Proposed Respondent admits the facts necessary to establish jurisdiction.

3.  Proposed Respondent waives:

    a.  Any further procedural steps;

    b.  The requirement that the Commission's Decision contain a statement of findings of fact and conclusions of law; and

    c.  All rights to seek judicial review or otherwise to challenge or contest the validity of the Decision and Order issued pursuant to this Consent Agreement.

4.   This Consent Agreement will not become part of the public record of the proceeding unless and until it is accepted by the Commission. If the Commission accepts this Consent Agreement, it, together with the draft Complaint, will be placed on the public record for 30 days and information about them publicly released. Acceptance does not constitute final approval, but it serves as the basis for further actions leading to final disposition of the matter. Thereafter, the Commission may either withdraw its acceptance of this Consent Agreement and so notify Proposed Respondent, in which event the Commission will take such action as it may consider appropriate, or issue and serve its Complaint (in such form as the circumstances may require) and decision in disposition of the proceeding, which may include an Order. *See* Section 2.34 of the Commission's Rules, 16 C.F.R. § 2.34 ("Rule 2.34").

5.   If this agreement is accepted by the Commission, and if such acceptance is not subsequently withdrawn by the Commission pursuant to Rule 2.34, the Commission may, without further notice to Proposed Respondent: (1) issue its Complaint corresponding in form and substance with the attached draft Complaint and its Decision and Order; and (2) make information about them public. Proposed Respondent agrees that service of the Order may be effected by its publication on the Commission's website (ftc.gov), at which time the Order will become final. *See* Rule 2.32(d). Proposed Respondent waives any rights it may have to any other manner of service. *See* Rule 4.4.

6.   When final, the Decision and Order will have the same force and effect and may be altered, modified, or set aside in the same manner and within the same time provided by statute for other Commission orders.

7.   The Complaint may be used in construing the terms of the Decision and Order. No agreement, understanding, representation, or interpretation not contained in the Decision and Order or in this Consent Agreement may be used to vary or contradict the terms of the Decision and Order.

8.   Proposed Respondent agrees to comply with the terms of the proposed Decision and Order from the date that Proposed Respondent signs this Consent Agreement. Proposed Respondent understands that it may be liable for civil penalties and other relief for each violation of the Decision and Order after it becomes final.

**ZOOM VIDEO COMMUNICATIONS, INC.**

By:_____
    Eric Yuan
    Chief Executive Officer

Date:_____

By:_____
    Travis LeBlanc, Esq.
    Cooley LLP
    Attorney for Proposed Respondent

Date:_____

**FEDERAL TRADE COMMISSION**

By:_____
    Linda Holleran Kopp
    Attorney, Bureau of Consumer Protection

By:_____
    Ryan Mehm
    Attorney, Bureau of Consumer Protection

By:_____
    Caroline Schmitz
    Attorney, Bureau of Consumer Protection

**APPROVED:**

By: _____
    Maneesha Mithal
    Associate Director, Division of Privacy &
     Identity Protection

By: _____
    Andrew Smith
    Director, Bureau of Consumer Protection

Date:_____

192 3167

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:       Joseph J. Simons, Chairman
                     Noah Joshua Phillips
                     Rohit Chopra
                     Rebecca Kelly Slaughter
                     Christine S. Wilson

| | |
|---|---|
| **In the Matter of**<br><br>**ZOOM VIDEO COMMUNICATIONS, INC.,**<br>    **a corporation, d/b/a ZOOM.** | **DECISION AND ORDER**<br><br>**DOCKET NO. C-** |

**DECISION**

The Federal Trade Commission ("Commission") initiated an investigation of certain acts and practices of the Respondent named in the caption. The Commission's Bureau of Consumer Protection ("BCP") prepared and furnished to Respondent a draft Complaint. BCP proposed to present the draft Complaint to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge the Respondent with violations of the Federal Trade Commission Act.

Respondent and BCP thereafter executed an Agreement Containing Consent Order ("Consent Agreement"). The Consent Agreement includes: (1) statements by Respondent that it neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Decision and Order, and that only for purposes of this action, it admits the facts necessary to establish jurisdiction; and (2) waivers and other provisions as required by the Commission's Rules.

The Commission considered the matter and determined that it had reason to believe that Respondent has violated the Federal Trade Commission Act, and that a Complaint should issue stating its charges in that respect. The Commission accepted the executed Consent Agreement and placed it on the public record for a period of 30 days for the receipt and consideration of public comments. The Commission duly considered any comments received from interested persons pursuant to Section 2.34 of its Rules, 16 C.F.R. § 2.34. Now, in further conformity with the procedure prescribed in Rule 2.34, the Commission issues its Complaint, makes the following Findings, and issues the following Order:

**Findings**

1.  The Respondent is Zoom Video Communications, Inc., a Delaware corporation, with its principal office or place of business at 55 Almaden Boulevard, 6th Floor, San Jose, California 95113.

2.  The Commission has jurisdiction over the subject matter of this proceeding and over the Respondent, and the proceeding is in the public interest.

**ORDER**

**Definitions**

For purposes of this Order, the following definitions apply:

A.  "**Covered Incident**" means any instance in which any United States federal, state, or local law or regulation ("Breach Notification Law") requires, or would require if recorded or livestream video or audio content from a Meeting were included as a type of personal information covered by such Breach Notification Law, Respondent to notify any U.S. federal, state, or local government entity that information collected or received, directly or indirectly, by Respondent from or about an individual consumer was, or is reasonably believed to have been, accessed or acquired without authorization. For purposes of this definition, "Covered Incident" does not include any instance of unauthorized access or acquisition of video or audio content if Respondent determines that such instance: (a) affected fewer than 500 Users; (b) resulted from a User accessing the video or audio content by using a link, password, or other access information, obtained directly or indirectly, as a result of its distribution by a Meeting host or organizer; or (c) resulted from a Meeting that is offered or made publicly accessible by the Meeting host or organizer; or (d) the video or audio content was encrypted and the encryption key was not also accessed or acquired from Respondent by an unauthorized person.

B.  "**Covered Information**" means information from or about an individual, including: (a) a first and last name; (b) a physical address; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a telephone number; (e) a Social Security number; (f) a driver's license or other government-issued identification number; (g) a financial institution account number; (h) credit or debit card information; (i) recorded or livestream video or audio content, chat transcripts, documents, or any other multimedia content shared by Users during a Meeting; (j) a persistent identifier, such as a customer number held in a "cookie," a static Internet Protocol ("IP") address, a mobile device ID, or processor serial number; or (k) any information combined with any of (a) through (j) above.

C.  "**Credential**" or "**Credentials**" means the user name and password that a User utilizes for logging in or otherwise accessing Respondent's products or services.

2

D.      "**Meeting**" means a one-on-one or group videoconference on Respondent's platform, including but not limited to, webinars and conference room videoconference connectors.

E.      "**Meeting Service**" or "**Meeting Services**" means all features and ancillary services developed by or on behalf of Respondent and used in the context of a Meeting (*e.g.*, video, audio, chat, content-sharing, recording, and storage of recordings). "Meeting Service" or "Meeting Services" does not include any plugin, cookie, or application that is offered or provided by a third party, including but not limited to, applications offered by third parties through the Zoom app store.

F.      "**Respondent**" or "**Zoom**" means Zoom Video Communications, Inc., and its successors and assigns.

G.      "**Third-Party Security Feature**" means any feature or tool built into an internet browser or operating system that: (a) has been specified as a security feature in the developer's official release notes; or that (b) has been identified by Zoom Security Personnel designated by Respondent for this purpose, based on their experience and expertise in secure software development principles, as a feature that protects the security of a User against the risk of unauthorized access, collection, disclosure, use, misuse, loss, theft, alteration, destruction, or other compromise of the User's Covered Information. "Third-Party Security Feature" does not include any software, system, feature, or tool, including without limitation, any plugin, cookie, or application, that is not developed by or for the browser or operating system developer.

H.      "**User**" means any entity or individual that uses Zoom's Meeting Services.

I.      "**Zoom Security Personnel**" means any person(s) working by or on behalf of Respondent who has been trained in secure software development principles, including secure engineering and defensive programming concepts, such as Respondent's Chief Information Security Officer.

### Provisions

### I.  Prohibited Misrepresentations

**IT IS ORDERED** that Respondent, and Respondent's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any product or service, must not misrepresent in any manner, expressly or by implication:

A.  Respondent's collection, maintenance, use, deletion, or disclosure of any Covered Information;

B.  The security features, or any feature that impacts a Third-Party Security Feature, included in any Meeting Service, or the material changes included in any updates thereof;

3

C.  The extent to which Respondent protects any Covered Information from unauthorized access;

D.  The extent to which a User can control the privacy or security of any Covered Information collected and maintained by Respondent, and the steps the User must take to implement such controls;

E.  The categories of third parties to which Respondent makes Covered Information accessible; or

F.  The extent to which Respondent otherwise maintains the privacy, security, confidentiality, or integrity of Covered Information.

## II.  Mandated Information Security Program

**IT IS FURTHER ORDERED** that Respondent, and any business that Respondent controls directly or indirectly, in connection with the collection, maintenance, use, or disclosure of, or provision of access to, Covered Information, must, within sixty (60) days of issuance of this order, establish and implement, and thereafter maintain, a comprehensive information security program ("Program" or "Information Security Program") that protects the security, confidentiality, and integrity of such Covered Information. To satisfy this requirement, Respondent must, at a minimum:

A.  Document in writing the content, implementation, and maintenance of the Program, including all processes and procedures that will be used to implement all Program policies and safeguards;

B.  Provide the written Program and any material evaluations thereof or material updates thereto to Respondent's board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of Respondent responsible for Respondent's Program at least once every twelve (12) months and promptly (not to exceed thirty (30) days) after a Covered Incident;

C.  Designate a qualified employee or employees to coordinate and be responsible for the Program;

D.  Assess and document, at least once every twelve (12) months and promptly (not to exceed thirty (30) days) following a Covered Incident, internal and external risks to the security, confidentiality, or integrity of Covered Information that could result in the (1) unauthorized collection, maintenance, use, or disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, alteration, destruction, or other compromise of such information;

E.  Design, implement, maintain, and document safeguards that control for the internal and external risks Respondent identifies to the security, confidentiality, and integrity of Covered Information identified in response to sub-Provision II.D. Each safeguard must

4

be based on the volume and sensitivity of Covered Information that is at risk, and the likelihood that the risk could be realized and result in the (1) unauthorized collection, maintenance, use, or disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, alteration, destruction, or other compromise of such information. Such safeguards must also include:

1. Implementing a security review by Zoom Security Personnel designated by Respondent of all new Meeting Services software or software updates, prior to release that, at a minimum, includes:

   a. Policies, procedures, and any applicable technical measures for reviewing all new Meeting Service software or software updates for commonly known vulnerabilities, including those identified by the Open Web Application Security Project (OWASP) and critical or high severity vulnerabilities in the National Vulnerability Database (NVD), and remediating or otherwise mitigating any such vulnerabilities;

   b. Policies, procedures, and any applicable technical measures to: (i) determine whether any new Meeting Services software or software update is designed to circumvent or bypass, in whole or in part, any Third-Party Security Feature such that the Third-Party Security Feature no longer provides the same protection(s) for Users against the risk of unauthorized access, collection, disclosure, use, misuse, loss, theft, alteration, destruction, or other compromise of Users' Covered Information; and (ii) assess the risk of unauthorized access, collection, disclosure, use, misuse, loss, theft, alteration, destruction, or other compromise of the User's Covered Information that will result from such circumvention or bypass, based on the volume and sensitivity of Covered Information that is at risk, and the likelihood that the risk could be realized; and

   c. Policies, procedures, and any applicable technical measures so that Respondent will not implement any new Meeting Services software or software update that has been identified under Part II.E.1.b(i) of this Order as designed to circumvent or bypass a Third-Party Security Feature, unless: (i) Zoom Security Personnel determine that the bypass or circumvention does not create a material risk of unauthorized access, collection, disclosure, use, misuse, loss, theft, alteration, destruction, or other compromise of Users' Covered Information; or (ii) Respondent implements security measure(s) that offset or otherwise mitigate the risk(s) of unauthorized access, collection, disclosure, use, misuse, loss, theft, alteration, destruction, or other compromise of Users' Covered Information that were identified under Part II.E.1.b(ii) of this Order;

2. Implementing a vulnerability management program that includes:

   a. Conducting vulnerability scans of Respondent's networks and systems on at least a quarterly basis; and

   b.  Policies, procedures, and any applicable technical measures for remediating or otherwise mitigating any critical or high severity vulnerabilities promptly (but in no event later than thirty (30) days after the vulnerability is detected), unless Respondent documents its rationale for not doing so;

3. Implementing a default, randomized naming convention for recorded Meetings that are to be stored on Users' local devices, and instructing Users to employ a unique file name when saving such recorded Meetings;

4. Policies, procedures, and any applicable technical measures to: (a) systematically classify and inventory Covered Information in Respondent's control; (b) log and monitor access to repositories of Covered Information in Respondent's control; and (c) limit access to Covered Information by, at a minimum, limiting employee and service provider access to Covered Information to what is needed to perform that employee or service provider's job function;

5. Data deletion policies, procedures, and any applicable technical measures, including validating that all copies of Covered Information identified for deletion are deleted within thirty-one (31) days;

6. Policies, procedures, and any applicable technical measures designed to reduce the risk of online attacks resulting from the misuse of valid Credentials by unauthorized third parties, including: (a) requiring Users to secure their accounts with strong, unique passwords; (b) using automated tools to identify non-human login attempts; (c) rate-limiting login attempts to minimize the risk of a brute force attack; and (d) implementing password resets for known compromised Credentials;

7. Regular security training programs, on at least an annual basis, that are updated, as applicable, to address internal or external risks identified by Respondent under sub-Provision II.D of this Order, and that include, at a minimum:

   a.  Security awareness training for all employees on Respondent's security policies and procedures, including the requirements of this Order and the process for submitting complaints and concerns; and

   b.  Training in secure software development principles, including secure engineering and defensive programming concepts, for developers, engineers, and other employees that design Respondent's products or services or that are otherwise responsible for the security of Covered Information;

8. Technical measures to monitor all of Respondent's networks, systems, and assets within those networks to identify anomalous activity and/or data security events on Respondent's network, including unauthorized attempts to exfiltrate Covered Information from Respondent's networks;

9. Incident response policies, procedures, and any applicable technical measures, including centralized log management and documenting remedial security actions;

6

10. Technical measures designed to safeguard against unauthorized access to any network or system that stores, collects, maintains, or processes Covered Information, such as properly configured firewalls; properly configured physical or logical segmentation of networks, systems, and databases; and securing of remote access to Respondent's networks through multi-factor authentication or similar technology except for when accessing such networks is for the purpose of using Meeting Services; and

11. Protections, such as encryption, tokenization, or other same or greater protections, for Covered Information collected, maintained, processed, or stored by Respondent, including in transit and at rest;

F. Assess, at least once every twelve (12) months and promptly (not to exceed thirty (30) days) following a Covered Incident, the sufficiency of any safeguards in place to address the internal and external risks to the security, confidentiality, and integrity of Covered Information, and modify the Program based on the results;

G. Test and monitor the effectiveness of the safeguards at least once every twelve (12) months and promptly (not to exceed thirty (30) days) following a Covered Incident, and modify the Program based on the results. Such testing and monitoring must include penetration testing of Respondent's network at least once every twelve (12) months and promptly (not to exceed thirty (30) days) after a Covered Incident;

H. Select and retain service providers capable of safeguarding Covered Information they access through or receive from Respondent, and contractually require service providers to implement and maintain safeguards for Covered Information sufficient to address the internal and external risks to the security, confidentiality, or integrity of Covered Information;

I. Consult with, and seek appropriate guidance from, independent, third-party experts on data protection in the course of establishing, implementing, maintaining, and updating the Program; and

J. Evaluate and adjust the Program in light of any changes to Respondent's operations or business arrangements, a Covered Incident, new or more efficient technological or operational methods to control for the risks identified in sub-Provision II.D of this Order, or any other circumstances that Respondent knows or has reason to know may have a material impact on the effectiveness of the Program or any of its individual safeguards. At a minimum, Respondent must evaluate the Program at least once every twelve (12) months and modify the Program as necessary based on the results.

### III. Independent Program Assessments by a Third Party

**IT IS FURTHER ORDERED** that, in connection with compliance with Provision II of this Order, titled Mandated Information Security Program, Respondent must obtain initial and biennial assessments ("Assessments"):

A.  The Assessments must be obtained from one or more qualified, objective, independent third-party professionals ("Assessor"), who: (1) uses procedures and standards generally accepted in the profession; (2) conducts an independent review of the Program; and (3) retains all documents relevant to each Assessment for five (5) years after completion of such Assessment and (4) will provide such documents to the Commission within ten (10) days of receipt of a written request from a representative of the Commission. No documents may be withheld by the Assessor on the basis of a claim of confidentiality, proprietary or trade secrets, work product protection, attorney-client privilege, statutory exemption, or any similar claim;

B.  For each Assessment, Respondent must provide the Associate Director for Enforcement for the Bureau of Consumer Protection at the Federal Trade Commission with the name(s), affiliation, and qualifications of the proposed Assessor, whom the Associate Director shall have the authority to approve in her or his sole discretion;

C.  The reporting period for the Assessments must cover:  (1) the first one hundred eighty (180) days after the Information Security Program has been put in place for the initial Assessment; and (2) each two-year period thereafter for twenty (20) years after issuance of the Order for the biennial Assessments;

D.  Each Assessment must, for the entire assessment period:

1.  Determine whether Respondent has implemented and maintained the Information Security Program required by Provision II of this Order, titled Mandated Information Security Program;

2.  Assess the effectiveness of Respondent's implementation and maintenance of sub-Provisions II.A-J;

3.  Identify any gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program;

4.  Address the status of gaps or weaknesses in, or instances of material non-compliance with, the Information Security Program that were identified in any prior Assessment required by this Order; and

5.  Identify specific evidence (including documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor examined is (a) appropriate for assessing an enterprise of Respondent's size, complexity, and risk profile; and (b) sufficient to justify the Assessor's findings. No finding of any Assessment shall rely primarily on assertions or attestations by Respondent's management. The Assessment must be signed by the Assessor, state that the Assessor conducted an independent review of the Information Security Program and did not rely primarily on assertions or attestations by Respondent's

8

management, and state the number of hours that each member of the assessment team worked on the Assessment. To the extent that Respondent revises, updates, or adds one or more safeguards required under Provision II of this Order during an Assessment period, the Assessment must assess the effectiveness of the revised, updated, or added safeguard(s) for the time period in which it was in effect, and provide a separate statement detailing the basis for each revised, updated, or additional safeguard; and

E.  Each Assessment must be completed within sixty (60) days after the end of the reporting period to which the Assessment applies. Unless otherwise directed by a Commission representative in writing, Respondent must submit the initial Assessment to the Commission within ten (10) days after the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580. The subject line must begin, "In re Zoom Video Communications, Inc., FTC File No. 192 3167." All subsequent biennial Assessments must be retained by Respondent until the order is terminated and provided to the Associate Director for Enforcement within ten (10) days of request.

### IV.   Cooperation with Third Party Assessor(s)

**IT IS FURTHER ORDERED** that Respondent, whether acting directly or indirectly, in connection with any Assessment required by Provision III of this Order, titled Independent Program Assessments by a Third Party, must:

A.  Provide or otherwise make available to the Assessor all information and material in its possession, custody, or control that is relevant to the Assessment for which there is no reasonable claim of privilege;

B.  Provide or otherwise make available to the Assessor information about Respondent's networks and all of Respondent's IT assets so that the Assessor can determine the scope of the Assessment, and visibility to those portions of the networks and IT assets deemed in scope; and

C.  Disclose all material facts to the Assessor, and not misrepresent in any manner, expressly or by implication, any fact material to the Assessor's: (1) determination of whether Respondent has implemented and maintained the Information Security Program required by Provision II of this Order, titled Mandated Information Security Program; (2) assessment of the effectiveness of the implementation and maintenance of sub-Provisions II.A-J; or (3) identification of any gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program.

### V.   Annual Certification

**IT IS FURTHER ORDERED** that Respondent must:

9

A.  One (1) year after the issuance date of this Order, and each year thereafter, provide the Commission with a certification from a senior corporate manager, or, if no such senior corporate manager exists, a senior officer of Respondent responsible for Respondent's Information Security Program that: (1) Respondent has established, implemented, and maintained the requirements of this Order; and (2) Respondent is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission. The certification must be based on the personal knowledge of the senior corporate manager, senior officer, or subject matter experts upon whom the senior corporate manager or senior officer reasonably relies in making the certification.

B.  Unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re Zoom Video Communications, Inc., FTC File No. 192 3167."

## VI.    Covered Incident Reports

**IT IS FURTHER ORDERED** that Respondent, within thirty (30) days after the date of Respondent's discovery of a Covered Incident, but in any event no later than ten (10) days after the date Respondent first notifies any U.S. federal, state, or local government entity of the Covered Incident, must submit a report to the Commission. The report must include, to the extent possible:

A.  The date, estimated date, or estimated date range when the Covered Incident occurred;

B.  A description of the facts relating to the Covered Incident, including the causes of the Covered Incident, if known;

C.  A description of each type of Covered Information that was affected or triggered any notification obligation to the U.S. federal, state, or local government entity;

D.  The number of consumers whose information was affected or that triggered the notification obligation to the U.S. federal, state, or local government entity;

E.  The acts that Respondent has taken to date to remediate the Covered Incident and protect Covered Information from further exposure or access, and protect affected individuals from identity theft or other harm that may result from the Covered Incident; and

F.  A representative copy of any materially different notice sent by Respondent to consumers or to any U.S. federal, state, or local government entity.

Unless otherwise directed by a Commission representative in writing, all Covered Incident reports to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

10

Washington, DC 20580. The subject line must begin: "In re Zoom Video Communications, Inc., FTC File No. 192 3167."

## VII.    Acknowledgments of the Order

**IT IS FURTHER ORDERED** that Respondent obtain acknowledgments of receipt of this Order:

A.  Respondent, within ten (10) days after the effective date of this Order, must submit to the Commission an acknowledgment of receipt of this Order, sworn under penalty of perjury;

B.  For five (5) years after the issuance date of this Order, Respondent must deliver a copy of this Order to: (a) all principals, officers, directors, and LLC managers and members; (b) all employees, agents, and representatives with managerial responsibilities related to the subject matter of the Order; and (c) any business entity resulting from any change in structure as set forth in the Provision titled Compliance Reports and Notices. Delivery must occur within ten (10) days after the effective date of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities; and

C.  From each individual or entity to which Respondent delivered a copy of this Order, Respondent must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## VIII.    Compliance Reports and Notices

**IT IS FURTHER ORDERED** that Respondent make timely submissions to the Commission:

A.  One (1) year after the issuance date of this Order, Respondent must submit a compliance report, sworn under penalty of perjury, in which Respondent must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission, may use to communicate with Respondent; (b) identify all of Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, and the means of collection, maintenance, use, deletion, or disclosure of information; (d) describe in detail whether and how Respondent is in compliance with each Provision of this Order; and (e) provide a copy of each Acknowledgment of the Order obtained pursuant to this Order, unless previously submitted to the Commission;

B.  Respondent must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following: (a) any designated point of contact; or (b) the structure of the Respondent or any entity that Respondent has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising

11

under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order;

C.  Respondent must submit notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Respondent within fourteen (14) days of its filing;

D.  Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature; and

E.  Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: "In re Zoom Video Communications, Inc., FTC File No. 192 3167."

## IX.    Recordkeeping

**IT IS FURTHER ORDERED** that Respondent must create certain records for five (5) years after the issuance date of the Order, and retain each such record for five (5) years. Specifically, Respondent must create and retain the following records:

A.  Accounting records showing the revenues from all goods or services sold;

B.  Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.  Copies of all U.S. consumer complaints that were submitted to Respondent and relate to the subject matter of the Order, and any response(s) to such complaints;

D.  All records necessary to demonstrate full compliance with each Provision of this Order, including all submissions to the Commission;

E.  A copy of each widely disseminated and materially different representation by Respondent that describes (a) Respondent's collection, maintenance, use, deletion, or disclosure of any Covered Information; (b) the security features, or any features that impact a Third-Party Security Feature, included in any Meeting Service, or the changes included in any updates thereof; (c) the extent to which Respondent protects Covered Information from unauthorized access, including any representation on any website or other service controlled by Respondent that relates to the privacy, security,

12

confidentiality, and integrity of Covered Information; (d) the extent to which a User can control the privacy or security of Covered Information and the steps the User must take to implement such controls; and (e) the categories of third parties to which Respondent makes Covered Information accessible; and

F.  For five (5) years after the date of preparation of each Assessment required by this Order, all materials relied upon to prepare the Assessment, whether prepared by or on behalf of Respondent, including all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials concerning Respondent's compliance with related Provisions of this Order, for the compliance period covered by such Assessment.

## X.  Compliance Monitoring

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Respondent's compliance with this Order:

A.  Within fourteen (14) days of receipt of a written request from a representative of the Commission, Respondent must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury, appear for depositions, and produce records for inspection and copying;

B.  For matters concerning this Order, representatives of the Commission are authorized to communicate directly with Respondent. Respondent must permit representatives of the Commission to interview anyone affiliated with Respondent who has agreed to such an interview. The interviewee may have counsel present; and

C.  The Commission may use all other lawful means, including posing through its representatives as consumers, suppliers, or other individuals or entities, to Respondent or any individual or entity affiliated with Respondent, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XI.  Order Effective Dates

**IT IS FURTHER ORDERED** that this Order is final and effective upon the date of its publication on the Commission's website (ftc.gov) as a final order. This Order will terminate twenty (20) years from the date of its issuance (which date may be stated at the end of this Order, near the Commission's seal), or twenty (20) years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; *provided, however,* that the filing of such a complaint will not affect the duration of:

A.  Any Provision in this Order that terminates in less than twenty (20) years;

13

B.  This Order's application to any Respondent that is not named as a defendant in such complaint; and

C.  This Order if such complaint is filed after the Order has terminated pursuant to this Provision.

*Provided, further,* that if such complaint is dismissed or a federal court rules that the Respondent did not violate any provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Provision as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

April J. Tabor
Acting Secretary

SEAL:
ISSUED:

14