**Pages 1 - 16**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE ZOOM SECURITIES                )
LITIGATION                           )
_____)
                                     )
MICHAEL DRIEU, Individually          )
and on Behalf of All Others          )
Similarly Situated,                  )
                                     )
          Plaintiff,                 )
                                     )
   VS.                               )   **NO. 3:20-cv-02353 JD**
                                     )
ZOOM VIDEO COMMUNICATIONS,           )
INC., ERIC S. YUAN, and KELLY        )
STECKELBERG,                         )
                                     )
          Defendants.                )
_____)

                          San Francisco, California
                          Thursday, June 13, 2024

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ROBBINS GELLER RUDMAN & DOWD LLP
                    Post-Montgomery Center
                    One Montgomery Street, Suite 1800
                    San Francisco, California 94104
               BY:  **SHAWN A. WILLIAMS, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, California 92101
BY:  **ELLEN GUSIKOFF STEWART, ATTORNEY AT LAW**
**DARREN J. ROBBINS, ATTORNEY AT LAW**
**PATTON L. JOHNSON, ATTORNEY AT LAW**

For Defendant:

COOLEY LLP
3175 Hanover Street
Palo Alto, California  94304
BY:  **PATRICK E. GIBBS, ATTORNEY AT LAW**

**Thursday - June 13, 2024**                              **10:17 a.m.**

                          **P R O C E E D I N G S**

                              ---o0o---

THE CLERK:  Calling Civil 20-2353, Drieu vs. Zoom Video Communications, Inc.

THE COURT:  Thank you.

THE CLERK:  Use the microphone at the podium.

Counsel?

MR. WILLIAMS:  Good morning, Your Honor. Shawn Williams, Robbins Geller Rudman & Dowd, on behalf of plaintiffs; and I'm here with my colleagues Darren Robbins, Ellen Gusikoff Stewart, and Patton Johnson.

Ms. Gusikoff Stewart is going to be directing the argument for our side today.

THE COURT:  Oh, okay.

MR. WILLIAMS:  Thank you.

MR. GIBBS:  Good morning, Your Honor.  Patrick Gibbs from Cooley on behalf of the defendants.

THE COURT:  Okay.  All right.  Well, I mean, the settlement amount looks okay.  Here's what I think I need to know.

How much -- what is each person going to get, roughly?  I know you can't guarantee it, but just, what's your estimate?

MS. GUSIKOFF STEWART:  The estimate on the common shares, Your Honor, if every class member made a claim, would

be $3.08.

**THE COURT:**  Under the settlement?

**MS. GUSIKOFF STEWART:**  Yes.

**THE COURT:**  And what if we hit the home run?  How much would that be per share, or per claimant?  565 million, I think, was your --

**MS. GUSIKOFF STEWART:**  Yeah.  So --

**THE COURT:**  -- total victory figure; so how much of that?

**MS. GUSIKOFF STEWART:**  I guess about three times that.

**THE COURT:**  Okay.

**MS. GUSIKOFF STEWART:**  If we got -- we recovered a third, so --

**THE COURT:**  All right.

**MS. GUSIKOFF STEWART:**  -- it would be about $9.

**THE COURT:**  So it's about a third.  All right.  Okay.

All right.  I mean, it looks actually okay.

Here are the two things that I think you need to do. There needs to be a much longer period between the filing of your fee application and opt-outs and exclusion requests.  I typically require 60 days.  Okay?

**MS. GUSIKOFF STEWART:**  60 days.  Okay.

**THE COURT:**  Right now, you've got, looks like, 14 or something like that.

So did you send me a -- did you lodge a proposed order?

**MS. GUSIKOFF STEWART:**  We did, Your Honor.

**THE COURT:**  Okay.  So just go back and change those dates.  Okay?  Make sure that that's there.  All right?

Also, I require -- it's 2024.  How do we communicate best in 2024?

Judge is tapping the online portal.

Yes.  Okay?  I want online notices.  I don't want just first-class mail.

Look, I know in securities cases it's overwhelmingly, in most cases, the investment houses.  I get it.  There are still -- Zoom was a hot stock.  I think there are a lot of at-home people.  They are reachable.  Okay?

So figure out some way to get e-mail notice to them.  And some notice other than *The Wall Street Journal*, which only people like me read, over the age of 60.  Okay?  These people who are trading in Zoom are my kids' age because they were buying it and selling it during COVID because it was a hot meme and all that kind of stuff.  Figure out some way.  I want Facebook or Meta.  I want something online.  *Wall Street Journal*, I'd prefer you not even do it.  Okay?

**MS. GUSIKOFF STEWART:**  Okay.

**THE COURT:**  So you've got to redo it.  So I'm not going to approve this until I see it again.  But I need a much more robust online noticing, and not just sort of acting like it's 2005 for notice purposes.

**MS. GUSIKOFF STEWART:** We'll work with Zoom on that. Obviously, we'll have whatever e-mail addresses that the banks and the brokerages --

**THE COURT:** That's right.

**MS. GUSIKOFF STEWART:** -- have.

**THE COURT:** Yeah.

**MS. GUSIKOFF STEWART:** And as you know, it's not a consumer stock. It's not users of Zoom. So we may not have, you know, the e-mail addresses of the actual class members, which I know we're not going to have.

**THE COURT:** Well, put it on the Zoom website. Look, just put it on the Zoom website. Okay? I mean, this is an online company, and it's being bought by people who trade in online stocks. Their lives are online. So don't put it in the back of the *Wall Street Journal*. That just doesn't make any sense to me.

So I'm not -- the notice part is disapproved. You need to redo the dates. I'm not granting preliminary approval on that basis today. Everything else is fine. You've got to fix all that. I want a much more robust notice program. Okay?

**MS. GUSIKOFF STEWART:** We will do that.

**THE COURT:** This all is for naught if -- look, as I said, there is a big asterisk here because it's Schwab and all the other people who buy in big chunks for their clients. Nevertheless, I think this stock is going to have more

individual people at home, day traders and so on, than others. So I want those people to know, and that means you've got to talk to them where they live, which is online.  Okay?

**MS. GUSIKOFF STEWART:**  Understood.

**THE COURT:**  So I want to see that.

And let's see.  There was one other thing.  Dates.

Oh.  Also, look, I know we're going to get to fees later, but $50,000 for the named plaintiff?  Where did that come from?

**MS. GUSIKOFF STEWART:**  I'm going to let Mr. Robbins address that because --

**THE COURT:**  I never do more than 1,500.  How did you possibly get to $50,000?

**MS. GUSIKOFF STEWART:**  I do believe it's warranted in this particular case and --

**THE COURT:**  I'm just asking for a preview.  I'm not going to -- I know it's going to come up in the fees motion, but it caught my eye sufficiently -- it hit me sufficiently hard, I just couldn't resist asking.

**MS. GUSIKOFF STEWART:**  Understood.  And we will address it more fulsomely in our --

**THE COURT:**  Just give me the top line.  Why?  What did this fellow do that deserves $50,000 --

**MS. GUSIKOFF STEWART:**  Your Honor, he --

**THE COURT:**  -- where everybody else is getting 3 per share.

**MS. GUSIKOFF STEWART:**  Your Honor, he actually interviewed -- went through the process of interviewing a bunch of law firms before he settled and requested that Robbins Geller be appointed lead counsel here.  He negotiated a very aggressive fee.

And he has been a very interactive, involved lead plaintiff.  He has -- was involved in the settlement negotiations.  He has been very active in staying up-to-date on what's going on.  He's a CEO, and so he was giving up his time to represent the class.  So under the PSLRA, he shouldn't be any worse off for doing that.

**THE COURT:**  I understand all that.  But, except for the CEO part, every person says the same thing to me.  "I interviewed firms.  I did some work.  I went to the mediation."  That doesn't add up to 50K, to me.

I'm certainly not going to pay him at a CEO -- if the idea is he's a CEO billing out at the equivalent of a thousand dollars an hour, that's not going to happen.  I'm not compensating based on job classification.

**MS. GUSIKOFF STEWART:**  Understood.  May I ask --

**THE COURT:**  Please.  Yeah, of course.

**MS. GUSIKOFF STEWART:**  -- Mr. Robbins to come to --

**THE COURT:**  Yeah.

**MR. ROBBINS:**  Good morning, Your Honor.  Darren Robbins for the lead plaintiff.

We thought you might want to hear a little more on that.

Your Honor is intimately familiar with the provisions of the PSLRA and how it works and how courts like this one were empowered to review the appointment to improve class actions, and part of the process is appointing the lead plaintiff that's responsible.

And I know Your Honor.  I'm familiar with some of your other cases, where people come in and, like you said, they attend mediations.

**THE COURT:**  Well, remember, though, in PSLRA cases, I actually have less discretion on who the lead plaintiff is. The lead plaintiff is defined by the greatest loss.  My hands are actually more tied in this kind of a case than they are in a non-securities Rule 23 case --

**MR. ROBBINS:**  Absolutely.

**THE COURT:**  -- because I have to do the person who meets the statutory requirement of the biggest loss.

It may not even be the person I want, but I have to do that.

**MR. ROBBINS:**  There is a presumption.  But, Your Honor, in enacting that statute, Congress, and in the legislative history, makes clear that they want a lead plaintiff, as you know, institution or individual, that will essentially drive the bus so that the lawyers aren't picking people, which historically was the practice.  Your Honor is

familiar with that.

And, correct, there is this presumption.  And Mr. Butt actually did -- I've done this a long time too, Your Honor, and very few --

**THE COURT:**  Well, I'm sure you've done it a lot longer than I have, but I understand, yeah.

**MR. ROBBINS:**  But I'm just saying, very few times, in my experience, does a lead plaintiff go through a formal process, interviewing -- not just phone calls, "Hey, what's this class action about?" but interviewing lawyers.  And as you'll see in the papers we'll present, Mr. Butt did exactly that.  He went through a very thorough process, spent dozens of hours talking with law firms, interviewing them.  And we'll present that to Your Honor.

**THE COURT:**  Did he drive a bargain?  Did he cap your fees?  Did he --

**MR. ROBBINS:**  Unfortunately, he did.  And at times it was somewhat contentious.  In fact --

**THE COURT:**  I notice you said he had a very precise fee cap.  Is that the product of your -- let's keep it at a high level.  I'm not asking for attorney-client privilege.  But is that the product of his work?

**MR. ROBBINS:**  Yes.

**THE COURT:**  That 18.75 percent?

**MR. ROBBINS:**  Yes.

**THE COURT:**  All right.

**MR. ROBBINS:**  Absolutely.

And, in part, I think Ms. Gusikoff wanted me here because I was the one who interacted, including during the settlement process, with him.  I mean, he was a very engaged lead plaintiff.

And it's not a class thing, where just because he's the CEO of an organization -- you know, there are many other courts across the country that recognize that if someone spends time, under Rule 23(e), you know, they shouldn't be -- the plan should be equitable to all class members; he shouldn't be worse off.  And all he's asking for here is a subset of the time that he spent.

And, in fact -- I think Your Honor's done a number of these -- to get about a third of the damages is pretty extraordinary.  This result appears to even be better on a damage -- recovery of damages than the *Wells Fargo* case that Your Honor approved recently.  And we distributed over 30 cents on the dollar or are in the process of distributing 30 cents on the dollar of losses.  These are extraordinary outcomes. Your Honor is well aware that in most cases, it's a couple of pennies on the dollar in a securities case.

**THE COURT:**  Not in my court.  I don't approve those, or if I do, I don't award fees, which is another case that was on the calendar today.  After our last hearing, the attorneys,

rightfully, withdrew any fee request because the settlement, which I reluctantly approved, was barely passible.

MR. ROBBINS:  I'm familiar with that.

THE COURT:  It was passible, but barely passible.

Let me ask you this.  I don't want to preempt your showing, and I'm going to keep an open mind.  But if you do want to persuade me on this -- and you have an uphill walk for it, given the amount of money -- I'm going to need to see something more than "I went to a lot of meetings."  Okay?

If he drove a hard bargain with you -- don't tell me the details; that's attorney-client -- you can tell me that.  Okay?  If you typically charge 20 to 30 -- 25 to 30 percent and he got you down to 18.75 and that was his work, I'll take that into account.  Okay?  If he was doing more than just being a wingman, being a wing person at the mediation, I can hear about that.

MR. ROBBINS:  Let me tell you something else he did that I think is unprecedented or with very few precedents, because I've looked at *Corcept*; I've looked at the other cases Your Honor has had and other cases in this district.  In fact, I have a list because we tried to compile one.

It is very rare, Your Honor, that you get a defendant to put up the money immediately when you reach a settlement before we get to preliminary approval.  And Your Honor has --

THE COURT:  What does that mean?  What did he do?

**MR. ROBBINS:**  He got what has now yielded over $7 million for this class above the 150.  How did he do that?  Because he demanded that the money be put up immediately.  And Your Honor knows that money goes into treasury.  So the fact --

**THE COURT:**  That was his idea?

**MR. ROBBINS:**  Yes.  He drove that.

**THE COURT:**  You-all don't do that automatically?

**MR. ROBBINS:**  No, not automatically, unfortunately.  As you know, in the last case we did, we did not get that, before you.

And he also did -- in this -- as you'll see in the -- without giving attorney-client privilege, you will see that the amount achieved here, which is very outsized, in light of these damages, 150 million is an extraordinary recovery.  I've recovered over a billion dollars in multiple cases, but the damages are big.  This is a very outsized recovery, and it was driven by Mr. Butt.  It absolutely was.

**THE COURT:**  Were you in the Facebook BIPA case?

**MR. ROBBINS:**  In the consumer case?

**THE COURT:**  The BIPA case, yeah.

**MR. WILLIAMS:**  BIPA, yeah.

**THE COURT:**  Were you in that?

**MR. WILLIAMS:**  Yes.

**MR. ROBBINS:**  Personally -- Mr. Williams was.

**THE COURT:**  I know Mr. Williams was.  Were you?

**MR. ROBBINS:**  I was not.

**THE COURT:**  Because I was going to say that you can tell me it's a billion, but 650 million came just from one case.  Anyway, okay.  I get it.  I get it.  All right.  Okay.  I'm interested to see.

Sounds like you know my position from my cases.  And, I mean, if this person really drove, in a managerial way, what was going on -- which I haven't seen much evidence of in ten years, I have to be candid with you -- I'm happy to see it; and if he got something like these concrete benefits of an extra 7 million in interest, I'd be interested in hearing about that too.

**MR. ROBBINS:**  And, Your Honor, I can tell you from the other side that you are right.  More often than not, lead plaintiffs have a name; they have a loss; but they are not engaged in day-to-day or in meaningful decisions.  That does happen more often than not.  So your perception is correct.

**THE COURT:**  And that's totally fine.  I mean, it is not a problem for that to happen.  The system is built that way.  It's not a criticism.  But that doesn't mean -- that means they don't get 100 times, 200 times, 300 times greater recovery than each class member.  So, perfectly fine, but you're not going to get a lot on the back end personally.

So that's all I'm asking.  Show me why this person -- and keep in mind, you're going to have to persuade me this is

materially different from those situations where people do show up -- now, look, let's be clear. You know this. They do look at discovery every so often; they do take a two-hour deposition; they do go to the mediation. That's not going to cut it.

So, I think I've been clear.

**MR. ROBBINS:** You have been. That's part and parcel of serving in the role. And as long as we have an open mind, Your Honor --

**THE COURT:** Of course.

**MR. ROBBINS:** -- we'll present the facts.

And you've seen a wide array of these cases, and you'll be able to make the appropriate and informed decision, and we'll give you those facts to make whatever is called for.

**THE COURT:** Now, to dress all this up, you can just do a short cover thing about notice and send me a -- you know that mailbox?

**THE LAW CLERK:** Proposed order box? JDPO.

**THE COURT:** Yeah, that's it, where you lodge drafts for -- just lodge the order there. Okay?

But the order is simple. You're just going to fix the -- well, you're going to have to put the notice provisions in too. Show me a good notice plan. All right? Do whatever you want. I'll leave it up to you. You can do it tomorrow, or you can do it in two weeks. I'm not going to put any deadlines on it.

It's your money, so you can let that motivate you.

But I'll take a look at it.  I won't have to have you come back in, in all likelihood.  If there's a problem, I'll have you come back in; but otherwise, I won't.

All right.  Mr. Gibbs, you've been standing patiently.  Anything to add?

MR. GIBBS:  Nothing to add, Your Honor.

THE COURT:  Okay.  We're all set.

All right.  Thanks for coming in.

MR. ROBBINS:  Thank you, Your Honor.

MR. GIBBS:  Thank you, Your Honor.

(Proceedings adjourned at 10:32 a.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Friday, June 21, 2024


_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter