ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
         – and –
DARREN J. ROBBINS (168593)
ELLEN GUSIKOFF STEWART (144892)
PATTON L. JOHNSON (320631)
HEATHER G. GEIGER (322937)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
elleng@rgrdlaw.com
pjohnson@rgrdlaw.com
hgeiger@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| In re ZOOM SECURITIES LITIGATION | ) ) ) | Case No. 3:20-cv-02353-JD |
| This Document Relates To: | ) ) ) | DECLARATION OF SHAWN A. WILLIAMS IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION |
| ALL ACTIONS. | ) ) ) ) ) ) | SETTLEMENT; APPROVAL OF PLAN OF ALLOCATION; AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARD TO LEAD PLAINTIFF |
| | ) | PURSUANT TO 15 U.S.C. §78u-4(a)(4) |

DATE:    October 9, 2025
TIME:    10:00 a.m.
JUDGE:  Honorable James Donato
CTRM:  11, 19th Floor

4938-3977-0453.v1

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ............................................................................................1

II.   THE LITIGATION .........................................................................................................9

      A.    The Initiation of the Action and Adam Ali's Appointment as Lead
            Plaintiff ...............................................................................................................9

      B.    The Complaint, Defendants' Motion to Dismiss, and the First Mediation..............9

      C.    Lead Plaintiff's Discovery Demanded from Defendants and Related
            Dispute ...............................................................................................................11

            1.    Lead Plaintiff's Fed. R. Civ. P. 34 Requests for the Production of
                  Documents .................................................................................................12

            2.    Disputes with Defendants over Scope of Production ...............................13

      D.    Lead Plaintiff's Discovery Served on Non-Parties and Related Disputes............13

            1.    The FTC.....................................................................................................13

            2.    Zoom's Business Consultants....................................................................14

            3.    Citizen Lab Employees.............................................................................14

III.  THE SETTLEMENT .......................................................................................................15

      A.    The Strengths and Weaknesses of the Case and the Risks Faced by Lead
            Plaintiff in the Litigation......................................................................................15

            1.    Risks to Proving a Material Misrepresentation.........................................16

            2.    Risks to Proving Scienter..........................................................................17

            3.    Risks to Proving Loss Causation ..............................................................17

            4.    Trial and Appellate Risk...........................................................................18

      B.    The Plan of Allocation Is Fair and Reasonable ....................................................19

      C.    Lead Counsel's Application for Attorneys' Fees and Expenses Is
            Reasonable ...........................................................................................................20

            1.    The Application for Attorneys' Fees Is Supported by Lead Plaintiff........21

            2.    The Requested Fee Is Supported by the Effort Expended and
                  Results Achieved ......................................................................................21

IV.   MISCELLANEOUS EXHIBITS........................................................................................23

V.    CONCLUSION..............................................................................................................24

DECL OF SHAWN WILLIAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT; PLAN OF
ALLOC; AND AN AWARD OF ATTYS' FEES & EXPENSES & AWARD TO LP - 3:20-cv-02353-JD        - i -
4938-3977-0453.v1

I, SHAWN A. WILLIAMS, declare as follows:

1. I am an attorney duly licensed to practice in the State of California and before this Court. I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), Court-appointed lead counsel for Lead Plaintiff Adam Y. Ali ("Lead Plaintiff")[1] and the Class,[2] in the above-captioned action pending in this Court.[3] My knowledge of the matters stated herein is based on my active participation in all material aspects of the prosecution and settlement of this action (hereinafter, the "Litigation" or the "Action"). Unless otherwise noted, I could and would competently testify that the following facts are true and correct.

2. I submit this declaration in support of Lead Plaintiff's motion for approval of: (a) the $150 million cash settlement on behalf of the Class (the "Settlement"); and (b) the proposed Plan of Allocation (the "Plan"). I also submit this declaration in support of Lead Counsel's motion for attorneys' fees and expenses and an award to Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4).

## I.    PRELIMINARY STATEMENT

3. This Action was brought against Zoom Video Communications, Inc. ("Zoom" or the "Company"), Eric S. Yuan ("Yuan") (together, "Defendants"), and former defendant Kelly Steckelberg ("Steckelberg") for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

---

[1] On June 26, 2025, Lead Plaintiff filed a Notice of Official Name Change (ECF 129) confirming his legal name change from Adam M. Butt to Adam Younas Ali. Therefore, Lead Plaintiff is referred to using his current legal surname of Ali throughout.

[2] Pursuant to this Court's May 28, 2025 Order Re Preliminary Approval and Notice (ECF 128), for the purpose of effectuating the Settlement, the Class is defined as:

> All Persons that purchased or otherwise acquired Zoom common stock or call options on Zoom common stock or sold put options on Zoom common stock ("Zoom Securities") between April 18, 2019, and April 6, 2020, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of Zoom during the Class Period, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any firm, trust, corporation, partnership, or other entity in which any Defendant has or had a controlling interest. Also excluded from the Class will be any Person who timely and validly seeks exclusion from the Class.

[3] Capitalized terms not otherwise defined herein have the same meanings as those ascribed to them in the Stipulation of Settlement (ECF 127-2) ("Stipulation").

4.    The Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF 63) ("Complaint") alleges that Defendants and Steckelberg made false and misleading statements and omissions concerning the Company's operations; the security capabilities (including the ability to use AES 256-bit end-to-end encryption) available in its main product offering, Zoom Meetings; and its collection and use of its users' personal data.

5.    Specifically, the Complaint alleges that, against a backdrop of heightened scrutiny on tech companies' collection of vast amounts of user data, Zoom misleadingly emphasized its commitment and effort to secure private data, claiming it "put a high priority on security and data privacy." ¶10.[4] Zoom's Security Guide published during the Class Period (April 18, 2019 through April 6, 2020), specifically stated: "We've designed policies and controls to safeguard the collection, use, and disclosure of your information," and "are proud to exceed industry standards when it comes to your organizations communications." ¶43. Defendants also repeatedly assured that its users could "[s]ecure a meeting with E2E encryption," highlighting this robust encryption as a necessity for financial and medical customers. *See* ¶¶29-30, 32, 42. The Complaint alleges that the "end-to-end encryption" assurances had the industry standard meaning, *i.e.*, only the people in the meeting had the keys to access messages and meeting content. *See* ¶¶9(a) n.5, 34(a) n.7, 43, 56. Finally, in connection with data security and privacy, the Company Privacy Policy said: "We may collect . . . Personal Data about you," and: "We may collect . . . Facebook profile information (when you use Facebook to log-in . . . .)." *See* ¶¶8, 29.

6.    The Complaint alleges that these statements were materially false and misleading. Zoom did not and could not enable end-to-end encryption of its Zoom Meetings product. The Complaint further alleges that Zoom was not only collecting user personal data, Zoom was also sharing that personal data with Facebook, including personal data belonging to users who were not on Facebook. ¶48. Defendants were publicly rebuked for "shocking" violations of privacy and

---

[4]    All "¶_" or "¶¶_" references are to the Complaint; internal citations are omitted and emphasis is added throughout unless otherwise stated.

quickly announced they would remove the software that was unnecessarily collecting and sharing data with Facebook.  ¶¶48-49.

7.    The Complaint alleges that the truth about Defendants' materially false statements and omissions was revealed in a series of corrective disclosures.  For example, on March 26, 2020, the website Motherboard published an article that revealed that Zoom was sending data to Facebook, including from users without Facebook accounts, and noted there was "nothing in [Zoom's] privacy policy that addresses" that, by using Zoom, users may be providing data to Facebook.  ¶¶13, 48-49.  On March 30, 2020, *The New York Times* published an article revealing that Zoom was being investigated by the New York Attorney General for its security and privacy practices, including data sharing with Facebook and security vulnerabilities that allowed malicious websites to enable a user's webcam without consent.  ¶¶13, 52.

8.    On March 31, 2020, before the market opened, *The Intercept* reported that Zoom Meetings did not offer end-to-end encryption and quoted a Zoom spokesperson admitting that: "Currently, it is not possible to enable E2E [end-to-end] encryption for Zoom video meetings." ¶¶13, 56-60.

9.    On April 1, 2020, after the market closed, Defendants published a blog post admitting that Zoom Meetings were not end-to-end encrypted and apologizing for "incorrectly suggesting that Zoom meetings were capable of using end-to-end encryption."  ¶¶13, 62-63.  After the market closed on April 2, 2020, *The New York Times* published an article disclosing that "a data-mining feature on Zoom allowed some participants to surreptitiously have access to LinkedIn profile data about other users – without Zoom asking for their permission."  ¶¶13, 66-70.  On April 3, 2020, Citizen Lab issued a report disclosing that Zoom Meetings were not encrypted using AES-256 encryption but rather with weaker AES-128 encryption.  ¶¶13, 71-72.

10.    On April 4, 2020, *The Wall Street Journal* published an interview with Yuan stating that end-to-end encryption would not be available for at least a few months.  ¶¶13, 75.  Finally, between April 6-8, 2020, Zoom scrubbed a series of articles on Zoom's website, deleting all references to the availability of "end-to-end" encryption.  ¶¶13, 79-82.

11.    The Complaint alleges that Zoom's stock price declined in response to each of these disclosures, which incrementally and in the aggregate revealed the true state of affairs, falling from a closing price of $150.88 per share on March 30, 2020, to $113.75 on April 7, 2020 – a decline of 25% – as the artificial inflation resulting from Defendants' false and misleading statements was removed from the share price.  ¶¶15, 101-115.

12.    Defendants deny Lead Plaintiff's allegations.  They contend that they did not make any false or misleading statements and that they disclosed all information required to be disclosed by the federal securities laws.  They also contend that any decline in Zoom's stock price was due to reasons other than the disclosures related to the alleged false or misleading statements, and that they have other valid defenses to Lead Plaintiff's claims.

13.    The $150 million proposed Settlement is the culmination of three years of vigorously contested litigation with strong advocacy from both sides and represents an excellent result for the Class.  This result is beyond adequate, considering Lead Plaintiff negotiated a Settlement that recovers at least 32% of the estimated reasonably recoverable common stock damages.  This recovery is many multiples of the median percentage recovery (1.6%) for cases like this one with estimated investor losses of between $400 and $599 million from January 2015 through December 2024.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review*, at 26, Fig. 23 (NERA Jan. 22, 2025), attached as Ex. D.

14.    Lead Counsel zealously prosecuted the claims at every stage of the Litigation and defended them against Defendants' attacks.  But as detailed herein, pursuing discovery, including obtaining discovery of information from non-party consultants, achieving class certification, and proceeding to summary judgment and a jury trial presented substantial risks.  Even assuming Lead Plaintiff successfully litigated the action past each and every hurdle identified above to obtain a judgment against Defendants, collecting any recovery, let alone one of this magnitude, remained uncertain.  In agreeing to settle the Litigation, Lead Plaintiff and Lead Counsel were fully informed about the various strengths of their case, as well as the substantial risks they would face should litigation continue.    Lead Plaintiff remained well-informed throughout the Litigation and

DECL OF SHAWN WILLIAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT; PLAN OF ALLOC; AND AN AWARD OF ATTYS' FEES & EXPENSES & AWARD TO LP - 3:20-cv-02353-JD        - 4 -
4938-3977-0453.v1

settlement negotiations and ultimately approved the Settlement.  *See* Declaration of Adam Y. Ali ("Ali Decl."), attached hereto as Exhibit A.  In opting to settle, Lead Plaintiff and Lead Counsel concluded that settlement on the terms obtained was in the Class's best interest and was a significant recovery for the Class.

15.    Lead Counsel achieved the proposed Settlement after over three years of litigation, during which time Lead Counsel, among other things:

- successfully moved for appointment of Adam Ali as Lead Plaintiff and Robbins Geller as Lead Counsel (ECF 28, 46, 47, 56), including briefing an opposing movant's motion to reconsider the Court's Order appointing Lead Plaintiff;

- conducted an extensive investigation, culminating in the drafting and filing of the Complaint;

- successfully opposed Defendants' motion to dismiss the Complaint resulting in the Court's February 16, 2022 Order Re Motion to Dismiss (ECF 78, 80, 83, 86);

- successfully opposed Defendants' motion for partial reconsideration of the motion to dismiss order (ECF 90, 92, 95);

- prepared and served initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A);

- prepared and served discovery to Defendants and non-parties, met and conferred, and fully briefed a dispute concerning the scope of discovery (ECF 102);

- obtained and reviewed over 138,000 pages of documents from Defendants and non-parties;

- responded to discovery requests from Defendants; and

- engaged in extended mediation negotiations under the supervision of former U.S. District Judge Layn R. Phillips of Phillips ADR Enterprises ("Judge Phillips"), including the exchange of detailed mediation statements (which involved consultations with various experts), that culminated in a mediator's proposal that the Parties accepted.

16.    The proposed Settlement of $150 million cash is the direct product of Lead Plaintiff's and Lead Counsel's efforts over the past several years, including those described in this declaration.  The Settlement is also the product of the Parties' arm's-length negotiations, including a formal mediation session, facilitated by Judge Phillips, one of the nation's foremost mediators, and continued negotiations over the course of several months.  These negotiations were conducted

by experienced counsel with an intimate understanding of the case. After careful consideration of the Parties' positions, Judge Phillips made a mediator's proposal to settle this Action for a cash payment of $150 million. Both sides accepted Judge Phillips' proposal, and agreed to the material terms of the Settlement on July 12, 2023.

17. Lead Counsel and Lead Plaintiff believe that this Settlement represents an excellent result for the Class. Based upon the investigation, research, analysis, motion practice, and factual discovery conducted, Lead Plaintiff believes that his case had significant merit and perseverance through three years of litigation resulted in the discovery of substantial evidence in support of the alleged claims.

18. Despite the strength of the evidence developed in discovery, there were substantial risks to Lead Plaintiff's ability to obtain, protect, and recover damages on a favorable judgment at trial. This included Lead Plaintiff's ability to receive additional discovery and evidence to support his claims. For example, Defendants resisted producing key documents that would support Lead Plaintiff's claims, including evidence concerning end-to-end encryption of Zoom Meetings and relevant post-Class Period events, which at the time of settlement already required requests for Court intervention. Non-party consultants were likewise resisting production of relevant documents and evidence which required numerous meet and confer discussions and likely motion practice.

19. Defendants also vigorously contested liability and planned to marshal evidence at trial they hoped would convince the fact finder that the alleged misrepresentation concerning the ability for Zoom Meetings to be end-to end-encrypted was not material.

20. Lead Plaintiff also anticipated a battle of the experts on numerous disputed issues at trial. Each side was expected to retain experts who were expected to offer opposing testimony about end-to-end encryption, industry standards, and loss causation and damages. There could be no guarantee that a jury would find Lead Plaintiff's expert testimony more convincing than the countervailing testimony offered by Defendants' retained formidable experts.

21. Even if Lead Plaintiff prevailed at trial, there was also significant risk of delay in providing Class members with compensation for the harm caused by Defendants' fraud. Post-trial

DECL OF SHAWN WILLIAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT; PLAN OF ALLOC; AND AN AWARD OF ATTYS' FEES & EXPENSES & AWARD TO LP - 3:20-cv-02353-JD    - 6 -
4938-3977-0453.v1

proceedings, including proceedings attendant to the determination of damages, threatened to delay the Class' recovery on any favorable judgment obtained at trial. In all likelihood, Defendants would appeal any verdict achieved in Lead Plaintiff's favor and the appeals process could span years, during which time the Class would receive no recovery.

22. Any appeal would also create the risk of reversal, in which case the Class would receive nothing after having prevailed on the claims at trial. All of these factors, together with the other factors discussed herein, were considered by Lead Plaintiff and Lead Counsel in concluding on balance that the mediator's proposal to settle the Litigation for $150 million was fair, reasonable, adequate, and in the best interests of the Class. It is therefore respectfully submitted that the Settlement confers a substantial benefit on the Class and eliminates the significant risks inherent in trial and post-trial proceedings. The Settlement should be approved as fair, reasonable, and adequate.

23. Lead Counsel prosecuted the Litigation on a wholly contingent and "at risk" basis, advancing and incurring substantial litigation expenses, charges, and costs over the years. Lead Counsel shouldered substantial risk in doing so, and, to date, has not received any compensation for its efforts. Accordingly, in consideration of Lead Counsel's extensive efforts on behalf of the Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 18.75% of the Settlement Amount (and all interest on such amount at the same rate and for the same period as earned by the Settlement Fund).

24. As set forth in the accompanying Memorandum of Points and Authorities in Support of Motion for an Award of Attorneys' Fees and Expenses and Award to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee Memorandum"), the requested fee of 18.75% of the Settlement Amount (plus interest accrued thereon) is within the range of fees awarded in Private Securities Litigation Reform Act of 1995 ("PSLRA") securities class action settlements, and well below the Ninth Circuit's presumptively reasonable 25% benchmark rate, and is justified in light of the exceptional result achieved for the Class and the significant risks undertaken by Lead Counsel in this complex litigation. *See* Declaration of Professor William B. Rubenstein in Support of Plaintiffs' Motion for Attorney's Fees, attached hereto as Exhibit B. To date, no Class Member

has objected.  Lead Counsel submits that the fee application is fair to the Class, under all applicable standards, and warrants the Court's approval.

25.	Lead Counsel also seeks payment for expenses, costs, and charges of $262,670.49, which were reasonably and necessarily committed to the prosecution of the Litigation over the last three years.  These expenses include, among others: (a) the fees and expenses of experts and consultants whose services were required for the successful prosecution and resolution of this case; (b) imaging, shipping, and managing a database of documents for the Litigation; (c) online factual and legal research; and (d) mediation expenses.

26.	Lead Counsel also seeks approval of the proposed Plan of Allocation, which Lead Counsel submits is fair and reasonable.  Lead Counsel drafted the Plan with the assistance of Lead Plaintiff's damages expert.  As further described below and in the Notice, the Plan provides formulas for calculating the recognized claim of each Class Member that submits a Proof of Claim form based on when the claimant transacted in Zoom securities, and which security they transacted in.  Each Authorized Claimant, including Lead Plaintiff, will receive a *pro rata* distribution pursuant to the Plan, and Lead Plaintiff will be subject to the same formula for distribution of the Net Settlement Fund.

27.	Additionally, Lead Plaintiff seeks an award of $48,750.00 in connection with his representation of the Class pursuant to 15 U.S.C. §78u-4(a)(4).  Lead Plaintiff dedicated considerable time overseeing this Litigation, including time spent investigating potential claims, securing appropriate legal counsel, discussing litigation strategy, case development, settlement negotiations, and attorneys' fees with Lead Counsel, all of which inured favorably to the Class.  Lead Plaintiff actively monitored the Litigation and supervised Lead Counsel.  After detailed discussions with Lead Counsel, Lead Plaintiff approved the Settlement.  Lead Plaintiff also approves of Lead Counsel's fee request, which he negotiated with Lead Counsel.

## II.    THE LITIGATION

### A.    The Initiation of the Action and Adam Ali's Appointment as Lead Plaintiff

28.    On April 7, 2020, the first complaint in the Litigation was filed.  ECF 1.  On June 8, 2020, plaintiff Adam Ali filed a motion to be appointed lead plaintiff.  ECF 28.  There were two other competing motions for lead plaintiff.  ECF 34, 38.  On July 16, 2020, the Court held a hearing on the appointment of lead plaintiff.  ECF 54.  On November 4, 2020, the Court appointed Adam Ali as Lead Plaintiff and Robbins Geller as Lead Counsel (the "Lead Plaintiff Order").  ECF 56.

29.    On November 18, 2020, one of the lead plaintiff movants filed a motion for leave of Court to file a motion for reconsideration of the Lead Plaintiff Order.  ECF 58.  On January 5, 2021, the Court granted the request and set a deadline for Lead Plaintiff to file a response to the reconsideration request.  ECF 64.  On February 2, 2021, Lead Plaintiff filed his opposition to the motion for reconsideration of the Lead Plaintiff Order.  ECF 70.  On April 12, 2021, the Court denied the motion for reconsideration of the Lead Plaintiff Order.  ECF 74.

### B.    The Complaint, Defendants' Motion to Dismiss, and the First Mediation

30.    On November 12, 2020, Lead Plaintiff and Defendants filed a Stipulation and [Proposed] Order establishing a schedule for filing the consolidated complaint and any responses thereto.  ECF 57.  The Court adopted the proposed schedule on November 24, 2020.  ECF 59.

31.    Lead Plaintiff and Lead Counsel continued their exhaustive investigation into the putative class's claims, which consisted of, *inter alia*: (i) identifying, locating, and interviewing former Zoom employees and other knowledgeable witnesses likely to have information pertinent to the claims alleged; (ii) researching the Defendants and Zoom's business model; (iii) a thorough review and analysis of Zoom's public disclosures, including: (a) transcripts of Zoom's quarterly conference calls held to discuss the Company's financial results and other presentations made by top management at investor conferences; (b) Zoom's periodic filings with the SEC, including Forms 10-K filed annually, and Forms 10-Q filed quarterly; (c) Zoom's public offering documents filed with the SEC; and (d) records reflecting the Defendants' and other Company insiders' trades involving Zoom securities in Form 4s filed with the SEC; and (iv) an examination of industry and

Company stock price reaction to Defendants' alleged misstatements and corrective disclosures, including detailed reports discussing Zoom and its public disclosures issued by industry analysts.

32.    On December 23, 2020, based upon the findings of the extensive investigation, Lead Plaintiff filed the Complaint.  ECF 63.  As detailed above, the Complaint alleged claims for violations of §§10(b) and 20(a) of Exchange Act against all Defendants and former defendant Steckelberg.

33.    After the motion for reconsideration of the Lead Plaintiff Order was filed, on January 15, 2021, Defendants filed a motion to designate an operative complaint should the Lead Plaintiff Order be vacated.  ECF 67.  Lead Plaintiff opposed Defendants' motion on January 19, 2021.  ECF 68.  The Court ordered that Defendants did not need to respond to the Complaint filed on December 23, 2020, pending a further order from the Court.  ECF 69.  On April 26, 2021, Lead Plaintiff and Defendants filed a joint stipulation setting the schedule for Defendants' response to the Complaint.  ECF 75.  The Court adopted the proposed schedule on April 27, 2021.  ECF 76.

34.    On May 20, 2021, Defendants and Steckelberg filed a motion to dismiss the Complaint and a request for judicial notice in support of the motion to dismiss, arguing that Lead Plaintiff failed to adequately allege any actionable misrepresentations, that any alleged misrepresentation was made with scienter, or that Lead Plaintiff had adequately alleged loss causation.  ECF 78-79.  On July 9, 2021, Lead Plaintiff opposed the motion to dismiss and the request for judicial notice.  ECF 80-81.  On August 9, 2021, Defendants and Steckelberg filed their reply briefs in support of their respective motion to dismiss and motion for judicial notice.  ECF 82-83.  On August 23, 2021, the Court took the motion to dismiss under submission and vacated the August 26, 2021 hearing.  ECF 84.

35.    On February 16, 2022, the Court denied in part and granted in part the motion to dismiss.  ECF 86 ("MTD Order").  The MTD Order dismissed Steckelberg from the Litigation and dismissed fourteen of the fifteen alleged false statements.  MTD Order at 3-4, 7-8.  Therefore, the only statement that remained in the case, which appeared in Zoom's April 18, 2019 Registration Statement and Prospectus, concerned Zoom's purported "robust security capabilities, including end-to-end encryption."  *See* MTD Order at 4.

36. On March 14, 2022, Defendants moved for partial reconsideration of the MTD Order (ECF 90), arguing that the only alleged misstatement remaining in the case was not false or misleading and was made in good faith. On March 29, 2022, Lead Plaintiff opposed the motion (ECF 92). Defendants filed their Answer to the Complaint on April 22, 2022. ECF 93.

37. On May 23, 2022, the parties, their counsel, and representatives of Defendants' D&O insurance carriers attended an all-day mediation with Judge Phillips. Prior to the mediation, the parties submitted and exchanged mediation statements. While that mediation took place with good faith negotiations, the Litigation remained unresolved at that time. The parties continued their mediation efforts with the assistance of Judge Phillips while simultaneously litigating the Action.

38. On March 8, 2023, the Court denied the motion for partial reconsideration of the MTD Order and discovery ensued. ECF 95.

**C.    Lead Plaintiff's Discovery Demanded from Defendants and Related Dispute**

39. The Parties engaged in fact discovery and disputes concerning fact discovery from March 2023, until the settlement in June 2023. Lead Plaintiff obtained and analyzed more than 138,000 pages of documents from Defendants and non-parties during the course of discovery.

40. Lead Plaintiff and Defendants filed a proposed scheduling order with the Court on March 17, 2023. ECF 97. The Court adopted a scheduling order on April 6, 2023. ECF 100. On March 23, 2023, the Parties held their Fed. R. Civ. P. Rule 26(f) conference. Over the following weeks, the Parties negotiated, among other things, the scope of discovery, electronic discovery matters such as the form of production, and a protective order. On April 5, 2023, the Parties submitted a Rule 26(f) discovery plan which, among other matters, set forth a summary of the factual allegations, described the principal legal issues in dispute, and detailed the Parties' competing views over the anticipated scope of discovery.

41. The Parties also negotiated a stipulated protective order concerning the treatment of confidential information in this Litigation and a stipulated document production protocol to facilitate the efficient production of electronically stored information ("ESI") and hard-copy

documents. At the time of the Settlement, several disputes concerning the protective order and the ESI protocol remained unresolved and the Parties were preparing briefing on those issues.

42. On April 7, 2023, both Lead Plaintiff and Defendants served their Fed. R. Civ. P. 26(a)(1)(A) initial disclosures.

### 1. Lead Plaintiff's Fed. R. Civ. P. 34 Requests for the Production of Documents

43. On March 23, 2023, pursuant to Fed. R. Civ. P. 34, Lead Plaintiff served Lead Plaintiff's First Set of Requests for Production of Documents ("Lead Plaintiff's RFPs") to Defendants, containing 23 requests regarding all aspects of Lead Plaintiff's claims. For example, Lead Plaintiff sought: (i) documents and communications concerning encryption or end-to-end encryption of the Company's Zoom Meetings product; (ii) documents and communications concerning the varying usages of the term "end-to-end encryption," including the discrepancy between the commonly-accepted definition and how Zoom used the term in public documents; (iii) documents and communications concerning the multiple government investigations into Zoom's encryption; and (iv) documents and communications concerning the preparation of Zoom's Security Guidelines, blogposts, whitepapers, and other public postings concerning Zoom's security capabilities.

44. On April 24, 2023, Defendants served their objections and responses to Lead Plaintiff's RFPs, in which they objected to every request as overbroad and unduly burdensome, claiming that because the Court only upheld the misleading statement concerning whether Zoom offered "end-to-end encryption," any documents concerning Zoom's "security capabilities" was overbroad and irrelevant to the claims. Lead Plaintiff disagreed with Defendants' position.

45. Prior to the Settlement, after months of negotiation and a submission of discovery disputes to the Court, Defendants produced four volumes of electronic documents, including 5,382 documents totaling 137,525 pages. Lead Counsel immediately engaged in the review and analysis of Defendants' documents in preparation for depositions and further mediation, as well as, ultimately, summary judgment, expert reports, and trial. The document productions also carried expenses related to hosting, storage, and maintaining a review platform for the documents.

**2.      Disputes with Defendants over Scope of Production**

46.      Shortly after receiving Defendants' responses and objections to Lead Plaintiff's RFPs, in May 2023, counsel for the Parties engaged in meet-and-confers to negotiate numerous issues concerning Defendants' anticipated production pursuant to Lead Plaintiff's RFPs, which were memorialized in extensive correspondence.  The issues in dispute centered on the relevance of the documents sought, including disputes concerning the definitions of "end-to-end encryption" and "security capabilities," documents provided to the Federal Trade Commission ("FTC"), and interviews with the SEC.

47.      On May 23, 2023, Lead Plaintiff filed a discovery letter outlining a dispute with Defendants concerning Defendants' refusal to search for and produce documents concerning end-to-end encryption as defined by Defendants during the Class Period as well as the commonly used definition.  ECF 102.  Lead Plaintiff also raised a dispute between the Parties concerning the time period for the search and production of documents provided to the FTC.  *Id.*  On June 7, 2023, two days prior to the deadline for Defendants' response to the discovery letter, Lead Plaintiff and Defendants reached an agreement with regard to the document production and Lead Plaintiff withdrew the May 23, 2023 discovery letter.  ECF 104.

**D.      Lead Plaintiff's Discovery Served on Non-Parties and Related Disputes**

48.      Lead Counsel also expended substantial time negotiating with and obtaining relevant evidence from 13 non-parties, including those described below.  Although negotiations were ongoing, by the time the Settlement was reached, Lead Plaintiff had received 233 documents spanning 836 pages from non-parties.

**1.      The FTC**

49.      On April 10, 2023, Lead Plaintiff noticed and served a subpoena *duces tecum* on the FTC.  The subpoena sought documents and communications concerning Zoom's security and encryption capabilities, and any non-privileged documents that concerned the FTC action against Zoom, including the settlement.  In May 2022, in connection with Lead Plaintiff's investigation of

the Action, the FTC had provided their Civil Investigative Demands directed at Zoom, in response to Lead Plaintiff's Freedom of Information Act request.

### 2.    Zoom's Business Consultants

50.    On April 24, 2023, Lead Plaintiff served subpoenas *duces tecum* on several of Zoom's non-party consultants, including: Alex Stamos, Lea Kissner, Matthew Green, Bishop Fox, CrowdStrike Holdings Inc., DarkTower, NCC Group, LLC, Praetorian Security Inc., and Trail of Bits Inc.  These subpoenas sought documents and communications concerning Zoom's end-to-end encryption capabilities, the projects Zoom employed the consultants for, and any involvement the consultants may have had with formal or informal investigations of Zoom by regulators, including the Department of Justice, the FTC, the New York Attorney's General Office, and the SEC.

51.    On May 8, 2023, Lead Plaintiff served an additional subpoena *duces tecum* on Jonathan Leitschuh, who wrote the July 8, 2019 medium.com post titled "Zoom Zero Day: 4+ Million Webcams & maybe an RCE? Just get them to visit your website!"  The subpoena sought documents and communications concerning Zoom's security and encryption capabilities, the evidence underlying the medium.com post, and any relationship between Mr. Leitschuh and Zoom.

52.    Lead Plaintiff's efforts to obtain discovery from Zoom's consultants was complicated by arguments raised by these non-parties, including that the subpoenaed materials were duplicative of documents Zoom would produce, that the subpoenas were overbroad based on the Court's MTD Order, and that the subpoenas sought documents that were not relevant to the case.

### 3.    Citizen Lab Employees

53.    On May 25, 2023, Lead Plaintiff noticed and served additional subpoenas *duces tecum* on Bill Marczak and John Scott-Railton, employees of Citizen Lab.  Citizen Lab revealed on April 3, 2020, that Zoom had significant weaknesses in its security and encryption.  The subpoena sought documents related to Zoom's security and encryption capabilities, the data concerning Citizen Lab's publications concerning Zoom, and any relationship(s) among Mr. Marczak, Mr. Scott-Railton, and Zoom.

### E.    Defendants' Discovery Directed at Lead Plaintiff

54.     On May 16, 2023, pursuant to Fed. R. Civ. P. 34, Defendants served 50 requests for the production of documents ("Defendants' RFPs") directed largely at Lead Plaintiff's investment strategies, investigation related to the Complaint, and fitness to serve as Lead Plaintiff. Defendants' RFPs included demands for Lead Plaintiff's trading records, brokerage statements, monthly and annual account statements, investment management agreements, and statements of financial condition, among other responsive documents.  Defendants' RFPs clearly sought to support their challenge to class certification.  On June 15, 2023, Lead Plaintiff served his objections and responses to Defendants' RFPs.

## III.     THE SETTLEMENT

55.     Lead Counsel believes that the Settlement is fair, reasonable, and adequate.  Indeed, Lead Counsel believes the $150 million cash settlement is an excellent result for Class Members, considering the risk of continued litigation, including a delayed recovery at trial (due to the inevitable post-trial and appellate proceedings) or potentially, recovering nothing at all.

**A.     The Strengths and Weaknesses of the Case and the Risks Faced by Lead Plaintiff in the Litigation**

56.     As outlined above, after significant investigation, thorough motion practice – including the motion to dismiss and the motion for reconsideration of the February 16, 2022 MTD Order – and the collection and review of document discovery, Lead Counsel provided Lead Plaintiff with a thorough understanding of the strengths and weaknesses of his claims in the Action and the prospects of recovering a judgment should the claims be successful through trial.  Based on the information and documents obtained through Lead Plaintiff's and Lead Counsel's investigation, publicly available documents, documents reviewed during discovery and mediation, and consultations with experts, Lead Plaintiff and Lead Counsel believe that the claims asserted in the Action have merit.  However, Lead Plaintiff and Lead Counsel recognize that Lead Plaintiff and Class Members faced considerable risks and defenses in continuing the Action.

57.     Although Lead Counsel developed a compelling Complaint, Defendants successfully obtained dismissal of 14 of the 15 alleged misstatements asserted in the Complaint as well as dismissal of former defendant Steckelberg.  MTD Order at 3-4, 7-8.  Moreover, even after

surviving the motion to dismiss and the motion for reconsideration, Lead Plaintiff and Class Members still faced significant hurdles at class certification, summary judgment, and ultimately at trial.  Based on all these factors, as well as the extensive experience of Lead Counsel in the litigation of securities class actions, Lead Counsel submits that the Settlement, which provides a very substantial recovery to Class Members, is far more beneficial than some of the realistic potential alternatives offered by continued litigation (including a possible complete dismissal of the Action), and is, therefore, fair, reasonable, and adequate.

58.    Lead Plaintiff also faced significant challenges in conducting discovery.  For example, as discussed *supra*, Defendants vehemently disputed the scope of discovery.  *See, e.g.*, ECF 102.  The issues in dispute centered on the relevance of the documents sought, and these relevance arguments were repeated by a number of non-parties that Lead Plaintiff subpoenaed. The risk that Lead Plaintiff would not obtain critical evidence in this Action weighed on the decision to reach the Settlement.  Moreover, Lead Plaintiff faced additional legal hurdles at class certification and summary judgment.  Indeed, while Lead Plaintiff would be required to prove all elements of his claims to prevail, Defendants need only succeed on one defense to potentially defeat the entire Action.  Risks of proving falsity, materiality, and scienter on the last remaining allegedly false statement present significant obstacles to Lead Plaintiff's success at summary judgment or trial.  Proving the difficulty of these claims, Defendants maintained that there was no single definition of "end-to-end" encryption at the time the statement was made; there was no intent to defraud or motive to commit fraud; and none of the purported corrective disclosures revealed new information to the market, as Zoom's access to the encryption keys was publicly disclosed on multiple occasions prior to the Class Period.  *See* ECF 90.  Even if successful in establishing liability, Lead Plaintiff was not guaranteed to recover the entirety (or even all) of the alleged damages, especially given the movement in Zoom's stock price during and following the end of the Class Period.

### 1.    Risks to Proving a Material Misrepresentation

59.    Defendants maintained that there was no single industry-accepted definition of "end-to-end encryption" and that in any event, the fact that Zoom offered end-to-end encryption

for one of its products (Zoom Chat) rendered the alleged false statement in Zoom's prospectus that Zoom "offer[s] robust security capabilities, including end-to-end encryption" not false and misleading.  ECF 90 at 5.  Defendants asserted and expected to put forth evidence that the statement in the prospectus concerned all of Zoom's products, not just Zoom Meetings; therefore because "Zoom Chat" was end-to-end encrypted based on how Zoom used the term, then no investor could have been misled by the statement. *Id.* at 10-13.

### 2. Risks to Proving Scienter

60.     Lead Plaintiff alleged that Zoom and defendant Yuan admitted knowledge of falsity and that based on Yuan's background and experience he would have understood that the description of end-to-end encryption was materially false and misleading.  Defendants contend that there were no particularized facts of what Yuan knew, when he knew it, or how such alleged knowledge would demonstrate his intent or recklessness.  ECF 78 at 16.  Additionally, Defendants took the position that Lead Plaintiff's scienter allegations hinge on two April 2020 Blog Posts that admitted that Zoom Meetings were not end-to-end encrypted.  ECF 90 at 13.  Defendants took the position that neither of the April 2020 Blog Posts were related to the alleged false statement in Zoom's prospectus, because that statement dealt with the general encryption capability, which was present in fact in one of Zoom's products.  ECF 90 at 14-15.  Defendants argued that even if the alleged false statement is deemed ambiguous, the evidence is insufficient to prove a strong inference that Defendants intended to deceive investors about that statement.  ECF 90 at 15.

### 3. Risks to Proving Loss Causation

61.     Defendants maintained that there was no single definition of "end-to-end" encryption at the time the statement was made; there was no intent to defraud or motive to commit fraud; and none of the purported corrective disclosures revealed new information to the market, as Zoom's access to the encryption keys was publicly disclosed on multiple occasions prior to the Class Period.  *See* ECF 90 at 5, 10-15; ECF 78 at 20-21.  Moreover, given Zoom's stock price recovery following alleged corrective disclosures and during and following the end of the Class Period, recoverable damages may have been severely limited, if not eliminated altogether.  *See* ECF 78 at 20-21.

DECL OF SHAWN WILLIAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT; PLAN OF ALLOC; AND AN AWARD OF ATTYS' FEES & EXPENSES & AWARD TO LP - 3:20-cv-02353-JD      - 17 -
4938-3977-0453.v1

### 4.      Trial and Appellate Risk

62.      Indeed, it's possible that the jury might not be convinced by the evidence presented in support of Lead Plaintiff's complex financial fraud allegations.  *See, e.g.*, *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-cv-01486, Corrected Final Judgment (N.D. Cal. Mar. 28, 2008) (ECF 1919) (case dismissed and judgment entered in favor of defendants after jury trial rejecting plaintiffs' federal securities laws violations).  Such a risk materialized recently, in *In re Tesla, Inc. Sec. Litig.*, No. 18-cv-04865 (N.D. Cal.), a securities class action brought under the Exchange Act in the United States District Court for the Northern District of California.  In that case, the lead plaintiff filed an offensive motion for summary judgment and the court ruled in its favor, concluding as a matter of law that the alleged misrepresentation at issue was false and defendant Elon Musk ("Musk") recklessly made the statement.  *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *17-*18 (N.D. Cal. Apr. 1, 2022).  Defendant Musk had also recently entered into a settlement agreement with the SEC arising from the same alleged false statements.  At trial, however, the jury found Tesla and Musk not liable for securities fraud, and after over four years of litigation, plaintiff got no recovery at all.  That verdict was ultimately affirmed by the United States Court of Appeals for the Ninth Circuit.  2024 WL 4688894 (9th Cir. Nov. 6, 2024).  Lead Plaintiff was also cognizant of the fact that a jury might have considered the importance of Zoom during the Covid-19 lockdowns, and the fact that so many people and businesses relied upon it during that time.

63.      There was also the risk that if Lead Plaintiff prevailed at trial, Defendants would appeal the verdict.  An appeal could take years to make its way through the court and create a risk of reversal in which case the Class would receive nothing even after prevailing at trial.  In *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.), a securities class action filed in 2002, and litigated by Robbins Geller, plaintiffs won a verdict after trial in 2009.  After post-trial proceedings, the district court entered a $2.4 billion judgment in 2013.  Defendants appealed to the United States Court of Appeals for the Seventh Circuit arguing, among other things, that plaintiffs' proof of loss causation at trial was insufficient to support the jury verdict.  Six years after the jury verdict and 13 years after the case was initially filed, the Seventh Circuit vacated the judgment, finding that

DECL OF SHAWN WILLIAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT; PLAN OF ALLOC; AND AN AWARD OF ATTYS' FEES & EXPENSES & AWARD TO LP - 3:20-cv-02353-JD        - 18 -
4938-3977-0453.v1

plaintiffs' expert on loss causation failed to account for firm-specific non-fraud factors that may have influenced the company's stock price and reversed, granting defendants a new trial primarily on the issue of loss causation. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 423 (7th Cir. 2015). Having considered the foregoing, it was the informed judgment of Lead Plaintiff and Lead Counsel, based upon all proceedings to date and their extensive experience in litigating shareholder class actions, that the proposed Settlement of this matter for $150 million in exchange for a mutual release of all claims, and including the other terms set forth in the Stipulation, provides fair, reasonable, and adequate consideration, and is in the best interests of the Class.

64.     In summary, while Lead Plaintiff developed strong evidence, several hurdles in acquiring further discovery, achieving class certification, and defeating summary judgment remained. These strengths and weaknesses of the case along with the trial, post-trial, and appellate risks were carefully considered by Lead Counsel and Lead Plaintiff as they engaged in settlement negotiations with Defendants and Judge Phillips and reached an initial agreement to settle the Litigation.

### B.     The Plan of Allocation Is Fair and Reasonable

65.     Upon entry of a judgment, and satisfaction of the other conditions to the Settlement, the Settlement Fund will cover certain administrative expenses, including the cost of providing notice to the Class; the cost of publishing notice; payment of taxes assessed against the Settlement Fund; costs associated with the processing of claims submitted; and Lead Counsel's approved fees and expenses, and any PSLRA award to Lead Plaintiff. The balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to Class Members who submit valid and timely Proofs of Claim. As detailed in the Notice, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit timely and valid claims.

66.     Lead Plaintiff, with the assistance of his damages expert, developed the Plan of Allocation. As explained in the Notice, the Plan of Allocation apportions the recovery, *pro rata*, among eligible Class Members based on the timing of transactions Zoom securities. In accordance

with the Plan of Allocation, the Claims Administrator shall determine each Class Member's share of the Net Settlement Fund based upon the recognized loss formula (the "Recognized Loss").

67.     A Recognized Loss will be calculated for each share of Zoom common stock purchased or otherwise acquired during the Class Period, for each call option purchased on Zoom common stock, and each put option sold on Zoom common stock during the Class Period.  The Recognized Loss is not intended to estimate the amount a Class Member might have been able to recover after a trial, nor to estimate the amount that will be paid to a Class Member pursuant to the Settlement.  The Recognized Loss is the basis upon which the Net Settlement Fund will be proportionately and equitably allocated to Authorized Claimants.[5]

### C.     Lead Counsel's Application for Attorneys' Fees and Expenses Is Reasonable

68.     Based on the time expended on behalf of the Class, the favorable result achieved in the face of considerable litigation risk, and the fully contingent nature of their representation, I also respectfully submit that Lead Counsel's request for an award of attorneys' fees equal to 18.75% of the Settlement Fund is fair and reasonable, and should be approved.

69.     As further detailed in the accompanying Fee Memorandum, the Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  In a common fund case, the district court can determine the amount of attorneys' fees to be drawn from the fund by employing a "percentage" method. *See Staton v. Boeing*, 327 F.3d 938, 968 (9th Cir. 2003).  The Ninth Circuit has established 25% of the common fund as a benchmark for attorneys' fees. *Id*.  Lead Counsel's request of 18.75% in this case is far below the established benchmark and below the percentage fees that courts in this Circuit have awarded in other complex class actions in the last year. *See, e.g.*, *Lamartina v. VMware, Inc.*, 2025 WL 1085566, at *1 (N.D. Cal. Mar. 31, 2025) (awarding

---

[5]     As detailed in the Notice, at least 97.5% of the Net Settlement Fund will be allocated to purchasers of Zoom common stock during the Class Period, and not more than 2.5% will be allocated to Class Members who transacted in Zoom call or put options during the Class Period.

fee of 25% of $102.5 million settlement); *Dicker v. TuSimple Holdings, Inc.*, 2024 WL 5181968, at *1 (S.D. Cal. Dec. 18, 2024) (awarding fee of 25% of $189 million settlement); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2024 WL 5341197, at *2 (N.D. Cal. Dec. 4, 2024) (awarding 29% of $200 million settlement fund); *In re Apple Inc. Sec. Litig.*, 2024 WL 4246282, at *1 (N.D. Cal. Sept. 18, 2024) (awarding fee of 22% of $490 million settlement); *In re Alphabet, Inc. Sec. Litig.*, 2024 WL 4354988, at *7 (N.D. Cal. Sept. 30, 2024) (awarding fee of 19% of $350 million settlement). Moreover, Lead Counsel committed more than 3,500 hours of work and incurred $262,670.49 in expenses, as detailed in the accompanying Declaration of Shawn A. Williams Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Declaration"). Based on the extensive efforts on behalf of the Class, as described above, Lead Counsel is applying for compensation on a percentage basis, and has requested a fee of 18.75% of the Settlement Amount, plus interest.

### 1. The Application for Attorneys' Fees Is Supported by Lead Plaintiff

70. This Litigation could not have been successfully prosecuted without the substantial participation of Lead Plaintiff, Adam Ali, who actively participated and consulted with Lead Counsel throughout the course of the Litigation and settlement negotiations. Lead Plaintiff also expended substantial time and effort reviewing briefs and orders of the Court, responding to discovery requests, searching for responsive documents, and significantly contributing to the litigation and settlement strategy. Through his efforts, Lead Plaintiff developed a detailed understanding of the strengths and weaknesses of this case, the risks of continued litigation, and the nature and extent of Lead Counsel's efforts on behalf of the Class. As reflected in the accompanying Ali Declaration, Lead Plaintiff also negotiated the attorneys' fee and believes the requested fee is fair and reasonable in light of the result achieved, and supports award of Lead Counsel's requested fee. Ali Decl., ¶¶11, 14.

### 2. The Requested Fee Is Supported by the Effort Expended and Results Achieved

71. As set forth herein, the $150 million cash settlement was achieved as a result of extensive and creative prosecutorial and investigative efforts, contentious and complicated motion

practice, hard-fought discovery, analysis of voluminous evidence, and arm's length settlement negotiations for nearly a year, as detailed herein.

72.    As discussed in greater detail above, this case was fraught with significant risks concerning liability and damages.  Lead Plaintiff's success was far from a certainty.  Defendants disputed whether the alleged false statements were even actionable, disputed that investors were misled, and sought to attribute any harm suffered to non-fraud factors.  Moreover, Defendants were likely to oppose any certification of the Action as a class action.  Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, he and the Class potentially faced years of costly and risky appellate litigation against Defendants, who have vast resources.  It is also possible that a jury could have found no liability or no damages.

73.    The proposed Settlement Amount, $150 million, represents approximately 32% of the estimated maximum common stock damages that Lead Plaintiff could reasonably expect to recover at trial.  If the jury rejected some of Lead Plaintiff's allegations of fraud for reasons described above, the amount of damages recovered would have been significantly less, and the percentage recovery under the Settlement proportionally higher, than stated above.  Of course, with only one alleged misrepresentation remaining as the basis of Lead Plaintiff's case at trial, if the jury rejected some of Lead Plaintiff's allegations of fraud, there was a very real possibility that such rejection would be fatal to the entirety of Lead Plaintiff's claims.

74.    As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.  These risk factors also support Lead Counsel's request for a fee of 18.75% of the Settlement Fund.  Lead Counsel is also among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of the firm and its partners are described in Exhibit F to the Robbins Geller Declaration.  Robbins Geller has served as lead or co-lead counsel in scores of class actions throughout the United States and in some of the most significant federal securities class actions, recovering billions for defrauded investors, including *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.) (recovering in excess of $7.2 billion for investors); *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.) (largest securities class action settlement

following a trial: $1.575 billion); *In re Am. Realty Cap. Props., Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (recovering $1.025 billion for investors); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.) (recovering $1.21 billion); *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314-JST (N.D. Cal.) (recovering over $809 million); *In re UnitedHealth Grp., Inc. PSLRA Litig.*, No. 06-cv-1691 (D. Minn.) (recovering over $925 million); *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio) (recovering $600 million for investors). The record results included additional cases in the Northern District of California, for example, *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR ($490 million); and *In re Alphabet, Inc. Sec. Litig.*, No. 3:18-cv-06245-TLT ($350 million). Furthermore, the recovery in this case was not without formidable well-accomplished adversaries as Defendants were represented by Cooley LLP. Despite Defendants' zealous representation on every aspect of the Litigation, Lead Counsel secured the $150 million settlement even as the Parties undertook discovery in order to prepare for trial.

75. This Action was prosecuted by Lead Counsel on an "at-risk" contingent fee basis. Lead Counsel committed over 3,500 hours of attorney and paraprofessional time and incurred $262,670.49 in expenses in the prosecution of the Litigation, as set forth in the accompanying Robbins Geller Declaration. We fully assumed the risk of an unsuccessful result and have received no compensation for our services during the course of this Litigation and have incurred significant expenses in litigating for the benefit of the Class. Any fees or expenses awarded have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort. Lead Counsel is justly entitled to the award of a reasonable percentage fee based on the benefit conferred and the common fund obtained. Under all the circumstances present here, an 18.75% fee is fair and reasonable.

## IV.    MISCELLANEOUS EXHIBITS

76. Attached as Exhibit C hereto is the Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, Digital Media Campaign, Establishment of Call Center Services and Website, and Requests for Exclusion Received to Date.

77.     Attached as Exhibit D hereto is a true and correct copy of Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025).

**V.     CONCLUSION**

78.     Lead Plaintiff and Lead Counsel obtained an outstanding result for the Class.  For all the foregoing reasons, Lead Counsel respectfully requests the Court approve the Settlement and Plan of Allocation, the fee and expense application, and award Lead Counsel 18.75% of the Settlement Amount plus $262,670.49 in expenses, plus the interest earned on both amounts at the same rate and for the same period as that earned on the Settlement Fund until paid, and award Lead Plaintiff, Adam Ali, $48,750 pursuant to 15 U.S.C. §78u-4(a)(4) in connection with his representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of July, 2025, in the State of California.

s/ Shawn A. Williams
SHAWN A. WILLIAMS
